Joseph V. **RAFFERTY** et al., Petitioners, Appellants,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE**, Respondent, Appellee.

No. 71–1121.

United States Court of Appeals,
First Circuit.

Heard Sept. 14, 1971.

Decided Dec. 6, 1971.

Robert J. McDonough, Boston, Mass., with whom Daniel S. Fischbach and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., were on brief, for petitioners, appellants.

David English Carmack, Atty. Tax Div., Dept. of Justice, with whom Johnnie M. Walters, Asst. Atty. Gen., Myer Rothwacks, and Elmer J. Kelsey, Attys. Tax Div., Dept. of Justice, were on brief, for respondent, appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Taxpayers, Joseph V. Rafferty and wife, appeal from a decision of the Tax Court, 55 T.C. 491, which held that a distribution to them of all the outstanding stock of a real estate holding corporation did not meet the requirements of § 355 of the Internal Revenue Code of 1954 and therefore was taxable as a dividend. Our opinion requires a construction of § 355 and the regulations thereunder.[1]

The facts, some of which have been stipulated, are relatively simple. The taxpayers own all the outstanding shares of Rafferty Brown Steel Co., Inc. (hereinafter RBS), a Massachusetts corporation engaged in the processing and distribution of cold rolled sheet and strip steel in Longmeadow, Massachusetts. In May 1960, at the suggestion of his accountant, Rafferty organized Teragram Realty Co., Inc., also a Massachusetts corporation. In June of that year RBS transferred its Longmeadow real estate to Teragram in exchange for all of the latter's outstanding stock. Thereupon Teragram leased back this real estate to RBS for ten years at an annual rent of $42,000. In 1962 the taxpayers also organized Rafferty Brown Steel Co., Inc., of Connecticut (RBS Conn.), which corporation acquired the assets of Hawkridge Brothers, a general steel products warehouse in Waterbury, Connecticut. Since its inception the taxpayers have owned all of the outstanding stock in RBS Conn. From 1962 to 1965 Hawkridge leased its real estate in Waterbury to RBS Conn. In 1965 Teragram purchased some unimproved real estate in Waterbury and built a plant there.[2] In

---

1. The relevant parts of § 355 Int.Rev. Code of 1954 are as follows:

   "§ 355. *Distribution of stock and securities of a controlled corporation*
   (a) *Effect on distributees.—*
   (1) *General rule.—If—*

   · · · · ·

   (B) the transaction was not used *principally as a device* for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both . . . [and]

   (C) the requirements of subsection (b) (relating to active businesses) are satisfied, . . .

   · · · · ·

   then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

   (b) *Requirements as to active business.—*

   (1) *In general.—*Subsection (a) shall apply only if either—
   (A) the distributing corporation, and the controlled corporation . . . is engaged immediately after the distribution in the active conduct of a trade or business, or

   · · · ·

   (2) *Definition.—*For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—
   (A) it is engaged in the active conduct of a trade or business, . . .
   (B) *such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,*
   . . . ." (Emphasis added.)

2. Teragram contracted for the construction of the plant, arranged mortgage financing by using the Longmeadow and Waterbury properties as security, and became solely obligated on the mortgage.

the same year it leased this plant to RBS Conn. for a term of fourteen years. Teragram has continued to own and lease the Waterbury real estate to RBS Conn. and the Longmeadow realty to RBS, which companies have continued up to the present time to operate their businesses at these locations.[3]

During the period from 1960 through 1965 Teragram derived all of its income from rent paid by RBS and RBS Conn. Its earned surplus increased from $4,119.05 as of March 31, 1961, to $46,743.35 as of March 31, 1965. The earned surplus of RBS increased from $331,117.97 as of June 30, 1959, to $535,395.77 as of June 30, 1965. In August 1965, RBS distributed its Teragram stock to the taxpayers. Other than this distribution, neither RBS nor Teragram has paid any dividends.

Joseph V. Rafferty has been the guiding force behind all three corporations, RBS, RBS Conn., and Teragram. He is the president and treasurer of Teragram which, while it has no office or employees, keeps separate books and records and filed separate tax returns for the years in question.[4]

On various occasions Rafferty consulted his accountant about estate planning, particularly about the orderly disposition of RBS.[5] While he anticipated that his sons would join him at RBS, he wanted to exclude his daughters (and/or his future sons-in-law) from the active management of the steel business. He wished, however, to provide them with property which would produce a steady income. The accountant recommended the formation of Teragram, the distribution of its stock, and the eventual use of this stock as future gifts to the Rafferty daughters. The taxpayers acted on this advice and also on the accountant's opinion that the distribution of Teragram stock would meet the requirements of § 355.

In their 1965 return the taxpayers treated the distribution of Teragram stock as a nontaxable transaction under § 355. The Commissioner viewed it, however, as a taxable dividend and assessed a deficiency. He claimed (a) that the distribution was used primarily as a device for the distribution of the earnings and profits of RBS or Teragram or both, and (b) that Teragram did not meet the active business requirements of § 355.

We turn first, to the Tax Court's finding that there was no device because there was an adequate business purpose for the separation and distribution of Teragram stock. In examining this finding we are guided by the rule that the taxpayer has the burden of proving that the transaction was not used principally as a device. Wilson v. Commissioner of Internal Revenue, 42 T.C. 914, 922 (1964), rev'd on other grounds, 353 F.2d 184 (9th Cir. 1965). Initially, we are disturbed by the somewhat uncritical nature of the Tax Court's finding of a business purpose. Viewing the transaction from the standpoint of RBS, RBS Conn., or Teragram, no immediate business reason existed for the distribution of Teragram's stock to the taxpayers. Over the years the businesses had been profitable, as witnessed by the substantial increase of the earned surplus of

---

3. Both properties are also suitable for use by other companies in other types of business.

4. The tax returns for Teragram for the five fiscal years 1961 through 1965 reveal the following deductions:

Compensation of officers ....... none
Salaries and wages ........... none
Rent ....................... none
Travel (all in 1965) .......... $16.52
Office expenses (all in 1965) ... 9.25

The total deductions taken by Teragram over the five year period were $171,135.-

94. The bulk of that amount was as follows:

Taxes ................... $43,980.59
Interest ................. 36,985.57
Depreciation ............. 74,213.21
Insurance ............... 5,565.26
Legal, auditing, and organizational expenses ....... 1,274.25
Repairs (all in 1965) .... 8,500.00
Fire Loss (all in 1962) .... 591.29
$171,110.17

5. Rafferty's concern is understandable in view of the fact that he had nine children.

every component, yet none had paid dividends. The primary purpose for the distribution found by the Tax Court was to facilitate Rafferty's desire to make bequests to his children in accordance with an estate plan.[6] This was a personal motive. Taxpayers seek to put it in terms relevant to the corporation by speaking of avoidance of possible interference with the operation of the steel business by future sons-in-law, pointing to Coady v. Commissioner of Internal Revenue, 33 T.C. 771 (1960), aff'd per curiam, 289 F.2d 490 (6th Cir. 1961).

In *Coady*, however, the separation was in response to a seemingly irreconcilable falling-out between the owners of a business. This falling-out had already occurred and, manifestly, the separation was designed to save the business from a substantial, present problem. *See also* Olson v. Commissioner of Internal Revenue, 48 T.C. 855, 867 modified, 49 T.C. 84 (1967). In the case at bar there was, at best, only an envisaged possibility of future debilitating nepotism. If avoidance of this danger could be thought a viable business purpose at all, it was so remote and so completely under the taxpayers' control that if, in other respects the transaction was a "device," that purpose could not satisfy the taxpayers' burden of proving that it was not being used "principally as a device" within the meaning of the statute.

■ Our question, therefore, must be whether taxpayers' desire to put their stockholdings into such form as would facilitate their estate planning, viewed in the circumstances of the case, was a sufficient personal business purpose to prevent the transaction at bar from being a device for the distribution of earnings and profits. While we remain of the view, which we first expressed in Lewis v. Commissioner of Internal Revenue, 176 F.2d 646 (1st Cir. 1949), that a purpose of a shareholder, qua shareholder, may in some cases save a trans-

action from condemnation as a device, we do not agree with the putative suggestion in Estate of Parshelsky v. Commissioner of Internal Revenue, 303 F.2d 14, 19 (2d Cir. 1962), that any investment purpose of the shareholders is sufficient. Indeed, in *Lewis*, although we deprecated the distinction between shareholder and corporate purpose, we were careful to limit that observation to the facts of that case, and to caution that the business purpose formula "must not become a substitute for independent analysis." 176 F.2d at 650. For that reason we based our decision on the Tax Court's finding that the transaction was "undertaken for reasons germane to the continuance of the corporate business." *Id.* at 647.

This is not to say that a taxpayer's personal motives cannot be considered, but only that a distribution which has considerable potential for use as a device for distributing earnings and profits should not qualify for tax-free treatment on the basis of personal motives unless those motives are germane to the continuance of the corporate business. *Cf.* Commissioner of Internal Revenue v. Wilson, 353 F.2d 184 (9th Cir., 1965); Treas.Reg. § 1.355–2(c). We prefer this approach over reliance upon formulations such as "business purpose," and "active business." *See generally* Whitman, Draining the Serbonian Bog: A New Approach to Corporate Separations Under the 1954 Code, 81 Harv.L.Rev. 1194 (1968). The facts of the instant case illustrate the reason for considering substance. Dividends are normally taxable to shareholders upon receipt. Had the taxpayers received cash dividends and made investments to provide for their female descendants, an income tax would, of course, have resulted. Accordingly, once the stock was distributed, if it could potentially be converted into cash without thereby impairing taxpayers' equity interest in RBS, the transaction

---

6. This plan incorporated two objectives: (1) the exclusion of daughters and sons-in-law from active management of the steel business and (2) providing his daugh-

ters with investment assets, safe and independent from the fluctuations of the steel business.

could easily be used to avoid taxes. The business purpose here alleged, which could be fully satisfied by a bail-out of dividends, is not sufficient to prove that the transaction was not being principally so used.

Given such a purpose, the only question remaining is whether the substance of the transaction is such as to leave the taxpayer in a position to distribute the earnings and profits of the corporation away from, or out of the business. The first factor to be considered is how easily the taxpayer would be able, were he so to choose, to liquidate or sell the spun-off corporation. Even if both corporations are actively engaged in their respective trades, if one of them is a business based principally on highly liquid investment-type, passive assets, the potential for a bail-out is real. The question here is whether the property transferred to the newly organized corporation had a readily realizable value, so that the distributee-shareholders could, if they ever wished, "obtain such cash or property or the cash equivalent thereof, either by selling the distributed stock or liquidating the corporation, thereby converting what would otherwise be dividends taxable as ordinary income into capital gain . . . ." Wilson v. Commissioner, *supra*, 42 T.C. at 923. In this connection we note that the Tax Court found that a sale of Teragram's real estate properties could be "easily arranged." 55 T.C. at 353. Indeed, taxpayers themselves stressed the fact that the buildings were capable of multiple use.

There must, however, be a further question. If the taxpayers could not effect a bail-out without thereby impairing their control over the on-going business, the fact that a bail-out is theoretically possible should not be enough to demonstrate a device because the likelihood of it ever being so used is slight. "[A] bail-out ordinarily means that earnings and profits have been drawn off without impairing the shareholder's residual equity interest in the corporation's earning power, growth potential, or voting control." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders (3d ed. 1971) § 13.06. If sale would adversely affect the shareholders of the on-going company, the assets cannot be said to be sufficiently separated from the corporate solution and the gain sufficiently crystallized as to be taxable. *See* Lewis v. Commissioner of Internal Revenue, *supra*, 176 F.2d at 650. In this case, there was no evidence that the land and buildings at which RBS carried on its steel operations were so distinctive that the sale of Teragram stock would impair the continued operation of RBS, or that the sale of those buildings would in any other way impair Rafferty's control and other equity interests in RBS.[7]

In the absence of any direct benefit to the business of the original company, and on a showing that the spin-off put saleable assets in the hands of the taxpayers, the continued retention of which was not needed to continue the business enterprise, or to accomplish taxpayers' purposes, we find no sufficient factor to overcome the Commissioner's determination that the distribution was principally a device to distribute earnings and profits.

The taxpayers fail for a further reason. The Tax Court found that Teragram was not an active business within the meaning of § 355(b).[8] The Commissioner contends that this result is mandated by Treas.Reg. § 1.355-1(c)[9] and

---

7. Our conclusion is reinforced by the fact that RBS and RBS Conn. were guaranteed occupancy of Teragram property under long term leases at fixed rents.

8. *See* note 1 *supra*.

9. Treas.Reg. § 1.355-1(c) (1955) :
   "(c) *Active business.* Section 355 is not applicable unless the controlled

corporation and the distributing corporation are each engaged in the active conduct of a trade or business. For specific rules in this connection see section 355(b) (1) and (2). *Without regard to such rules*, for purposes of section 355, a trade or business. . . . ordinarily must include the collection of income and the payment of expenses. *It does not include—*

the examples in Treas.Reg. § 1.355–1(d). The correctness of these regulations is questionable in view of the rejection of the separate business requirement of § 1.355–1(a) in United States v. Marett, 325 F.2d 28 (5th Cir. 1963) and Coady v. Commissioner of Internal Revenue, *supra*.[10] In fact, Revenue Ruling 64–147, 1964–1 Cum. Bull. pt. I, at 136, indicates that the Commissioner recognized a need to modify the § 355 regulations.[11] Moreover, we find that the regulations in this area are so broadly drawn that they may in some instances defeat the congressional purpose behind the enactment of § 355,[12] and we decline to rest our decision on so tenuous a foundation.

■■ It is our view that in order to be an active trade or business under § 355 a corporation must engage in entrepreneurial endeavors of such a nature and to such an extent as to qualitatively distinguish its operations from mere investments. Moreover, there should be objective indicia of such corporate operations. Prior to 1965 Teragram's sole venture was the leasing back to its parent of its only asset for a fixed return, an activity, in economic terms, almost indistinguishable from an investment in securities. Standing by itself this activity is the type of "passive investment" which Congress intended to exclude from § 355 treatment.[13] Furthermore, there

---

(1) The holding for investment purposes of stock, securities, land or other property, including casual sales thereof (whether or not the proceeds of such sales are reinvested),

"The ownership and operation of land or buildings all or substantially all of which are used and occupied by the owner in the operation of a trade or business, or

"A group of activities which, while a part of a business operated for profit, *are not themselves independently producing income* even though such activities would produce income with the addition of other activities or with large increases in activities previously incidental or insubstantial." (Emphasis added.)

10. Treas.Reg. § 1.355–1(a) (1955) states: "Section 355 does not apply to the division of a single business." The Commissioner has since acquiesed in the decisions holding this regulation invalid. *See* note 11 *infra.* At argument the Commissioner contended for a broad reading of the phrase in Treas.Reg. § 1.355–1(c) (3) which excludes from the active business definition those activities not themselves independently producing income. We find that these regulations are largely a restatement of the rejected separate business requirement of § 1.355–1(a), and we believe the *Coady* rationale is also applicable to functional divisions of existing businesses. *See* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, *supra* at § 13.04. We therefore reject the Commissioner's broad contention.

11. "The Internal Revenue Service will follow the decisions of the United States

Court of Appeals for the Fifth Circuit in the case of United States v. W. W. Marett, et al., 325 Fed. (2d) 28 (1963), and of the United States Court of Appeals for the Sixth Circuit in the case of Commissioner v. Edmund P. Coady, et ux., 289 Fed. (2d) 490 (1961), to the extent they hold that section 1.355–1(a) of the Income Tax Regulations, providing that section 355 of the Internal Revenue Code of 1954 does not apply to the division of a single business, is invalid.

.    .    .    .

"*Consideration is being given to a modification of the regulations.*" (Emphasis added.)

12. For example, the regulations could be construed to deny § 355 treatment to a large hotel chain which spun-off its land purchasing, hotel construction, and leasing activities from its hotel management operations if the spun-off corporation leased the completed hotels exclusively to the management corporation. We are reluctant to approve such regulations which appear to fly in the face of congressional intent.

13. Existing law reflects the Senate modification of the House proposal for § 355. In the accompanying report the Senate Finance Committee stated:

"Under the House bill, it is immaterial whether the assets are those used in an active business .  .  .  . Your committee returns to existing law in not permitting the tax free separation of an existing corporation *into active and inactive entities.* It is not believed that the business need for this kind of transaction is sufficiently great to permit a person in a position to afford a 10-year

are hardly any indicia of corporate operations. Prior to 1965 Teragram paid neither salaries nor rent. It did not employ independent contractors, and its only activity appears to have been collecting rent, paying taxes, and keeping separate books. Prior to 1965 it failed to meet either set of criteria for an active trade or business. We need not reach the more difficult question of whether its activities in 1965 constituted an active trade or business.

Affirmed.

delay in receiving income to do so at capital gain rather than dividend rates. Your committee requires that both the business retained by the distributing company and the business of the corporation the stock of which is distributed must have been actively conducted for the 5 years preceding the distribution, a safeguard against avoidance not contained in existing law." S.Rep.No.1622, 83d Cong., 2d Sess. 50–51 (1954) (emphasis added). U.S.Code Cong. & Admin.News, p. 4682.