Richard B. GADA

v.

UNITED STATES of America.

James P. WELLS and Barbara J. Wells

v.

UNITED STATES of America.

Gaetano GADA and Mildred Gada

v.

UNITED STATES of America.

Civ. Nos. H–220—H–222.

United States District Court,
D. Connecticut.

Sept. 12, 1978.

Walter B. Kozloski, New Britain, Conn., for plaintiffs.

James Littlefield, Steven Z. Kaplan, Dept. of Justice Tax Division, Washington, D. C., Frank H. Santoro, Asst. U. S. Atty., New Haven, Conn., for defendant.

### MEMORANDUM OF DECISION FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLARIE, Chief Judge.

This case encompasses three consolidated actions for the recovery of income taxes claimed by the plaintiffs to have been erroneously assessed for the tax year 1969. The issue before the Court is whether the issuance of shares of stock of two newly formed corporations to the shareholders of Guy's Oil Service Station, Inc. ("Guy's Oil") constituted a tax free spin off pursuant to Internal Revenue Code ("I.R.C.") § 355 and therefore was not a taxable distribution of corporate property under I.R.C. §§ 301 and 316. After a trial to the Court, the Court finds that the transaction did not satisfy the requirements necessary to receive tax-free treatment. The respective actions of the plaintiff-taxpayers requesting refunds are therefore dismissed.

#### Statement of Facts

In 1939, Gaetano and Mildred Gada, husband and wife, commenced a business on borrowed funds of $350.00 in which they sold and delivered home fuel oil and kerosene. They expanded their business activities in 1946 to include the operation of a gasoline service station. The business enterprise was incorporated in 1953 as Guy's Oil Service Station, Inc., and all shares of the corporation were issued to Gaetano and Mildred Gada, with the exception of two shares, which were issued to their attorney to be held in trust for their son, Richard. The business was further expanded when

the corporation began to acquire additional real estate and rent it to third parties. However, they kept separate business records for the various aspects of their businesses. The claimed impetus behind the land acquisition was the institution of a lawsuit against Guy's Oil following an explosion in 1955, which resulted from gasoline seeping through the soil onto adjacent property from the underground tanks owned by the corporation. In that lawsuit Guy's Oil was sued for $350,000, and the claims were finally settled in 1959, when the liability insurance carrier compromised the claims and settled the suit.

Subsequently, additional shares of stock in the original corporation were issued to Richard Gada and to the Gadas' daughter and son-in-law, Barbara J. and James P. Wells, so that at the beginning of 1969, the tax year in litigation, all of the stock of Guy's Oil was outstanding in the names of the following stockholders:

Gaetano Gada (father) ............278 shares
Mildred Gada (wife) ..............278 shares
Richard Gada (son) .............. 33 shares
Barbara Gada Wells and James
    Wells (daughter & son-in-law) .... 31 shares.

The officers of Guy's Oil were Gaetano, president; Richard, vice-president; and Mildred, secretary-treasurer. The same three officers also served as directors of the corporation.

Prior to 1969, Gaetano Gada was the major motivating force behind the corporation, and he was in complete command of all aspects of the business. He drove fuel oil trucks, pumped gasoline, repaired automobiles, bought and sold used cars and determined which real estate was to be bought, sold and leased. Gaetano was assisted in these activities by his son, Richard, while the books and records of the business were maintained by his wife, Mildred, who worked in the business office. From 1956 on, Gaetano Gada suffered a series of heart attacks, after which he was forced to convalesce before returning to work. On February 2, 1969, Richard broke his kneecap and was hospitalized and at the same time his father was also hospitalized with another heart attack.

During this period, the Gadas received offers to purchase the fuel oil portion of their business from at least four companies. Because of Gaetano's declining health and Richard's temporary incapacitation, the Gadas actively considered selling all or part of Guy's Oil. At an April 24, 1969 meeting of the stockholders and directors of Guy's Oil, it was resolved that the assets of the fuel oil business should be separated from the remainder of the business. On the aforesaid date, the son-in-law, James P. Wells, agreed to join the company on July 1, 1969. The elder Gadas thought it would eliminate business conflict if the son and son-in-law were assigned to separate business responsibilities. A corporate separation had been first proposed in 1956 by the corporation's accountant, Harry McLaughlin, as a practical mechanism for shielding the total assets of the business from future liability claims, similar to those which had arisen at the time of the gasoline explosion case.

Pursuant to their vote to effect a division of the assets of Guy's Oil, the stockholders and directors incorporated two new entities on July 1, 1969, Gada Realty Corporation ("Gada Realty") and Guy's, Inc. Gada Realty was to operate the real estate business; Guy's, Inc., the retail fuel oil business; and Guy's Oil was to continue the operation of the service station, which by now had expanded into a garage repair service and a used car dealer business.

The shares of the two new corporations were issued directly to the shareholders of Guy's Oil, each shareholder receiving the same number of shares as he held in the original corporation. Therefore, Guy's, Inc. and Gada Realty each issued 278 shares to Gaetano Gada, 278 shares to Mildred Gada, 33 shares to Richard Gada, and 31 shares to Barbara and James Wells. Additionally, the directors and officers of the two new corporations were the same individuals who served in those capacities for Guy's Oil. At this point in its development, the business had grown from its original $350.00 of borrowed capital in 1939 to a gross annual income of $600,000.

Gada Realty and Guy's, Inc. were capitalized by the transfer of certain assets from Guy's Oil In particular, Guy's Oil transferred all its real estate holdings to Gada Realty, and issued a check payable to Gaetano and Mildred Gada in the amount of $40,000, which they endorsed and deposited to the account of Gada Realty. The $40,000 was then used by Gada Realty to purchase certain real estate, consisting of a fuel oil business and a garage for auto and truck repairs from the Estate of David Peterson. Subsequently, Guy's Oil issued a further check in the amount of $10,000 payable to Gada Realty, which was used for making repairs to the building on the Peterson property. Finally, Guy's Oil issued a check in the amount of $10,540 payable to Guy's, Inc. for the purpose of capitalizing the latter corporation.

For the first 6 months after its incorporation, Guy's, Inc. received various services from Guy's Oil. The trucks which were used to deliver the fuel oil were owned by Guy's Oil and leased to Guy's, Inc. Customers of Guy's, Inc. were billed by Guy's Oil, and the wages of the truck drivers were paid by Guy's Oil.

Following its incorporation, Gada Realty leased office space to both Guy's Oil and Guy's, Inc. It also leased to Guy's Oil the gasoline station and the used car lot, which was located on the Peterson property. Harry McLaughlin, the Gadas' accountant, conceded at trial that, apart from the rentals paid by its two sister corporations, Gada Realty received only a very small income from the leasing of five residential properties and an auto body repair shop. Gada Realty employed no individuals; Mildred Gada, serving as secretary of the corporation, collected the rents and kept the books.

All three corporations are still in existence at the present time. While Mildred Gada still collects rents for Gada Realty, her husband has retired and is no longer active in any part of the business enterprise. Richard Gada is now president of Guy's Oil and is responsible for the daily operation of that corporation, which includes car sales, auto repairs, and the gasoline station business. James Wells, the son-in-law, is president and in charge of Guy's, Inc., which has the responsibility for the fuel oil business. It should be noted that, although the Gadas had seriously entertained the idea of selling all or part of their business nine years ago, none of the assets of any of the three corporations, except for one parcel of residential real estate, has been sold to date.

In filing their individual income tax returns for 1969, the plaintiffs in these consolidated actions failed to report the receipt of the Gada Realty and Guy's, Inc. stock as dividend income. The I.R.S., determining that the issuance of the shares in the new corporations constituted a taxable distribution of corporate property, assessed deficiencies against the taxpayers in 1972 in the following amounts, including interest:

Gaetano & Mildred Gada . . . . . . . . . . $74,436.23
Richard Gada . . . . . . . . . . . . . . . . . . . . $ 3,893.52
Barbara & James Wells . . . . . . . . . . . . $ 2,203.58

The taxpayers paid the deficiencies and filed timely claims for refunds, which were disallowed by the I.R.S. These actions seeking refunds of the amounts paid were subsequently commenced, the taxpayers arguing that the issuance of the shares of the two new corporations constituted tax-free distributions pursuant to I.R.C. § 355.

### Jurisdiction

The jurisdiction of this Court is properly invoked pursuant to 28 U.S.C. § 1346(a)(1), which gives the district courts original jurisdiction over civil actions brought against the United States for the recovery of any internal revenue tax alleged to have been erroneously collected.

### Discussion of the Law

The creation of two new corporations out of the assets of Guy's Oil constituted a corporate "spin off," which has been defined as the distribution by one corporation to its shareholders of the stock of its subsidiary. Bittker and Eustice, *Federal Income Taxation of Corporations and Shareholders*, ¶ 13.02 at 13–3 (3d ed. 1971) (hereinafter referred to as Bittker). In oth-

er words, following a spin off, the shareholders as a group own the same bundle of assets as they did prior to the spin off, but in a different corporate form. Whitman, *Draining the Serbonian Bog: A New Approach to Corporate Separations Under the 1954 Code*, 81 Harv.L.Rev. 1194, 1195 (1968) (hereinafter referred to as Whitman).

■ It is clear that unless the transaction in this case met the requirements of I.R.C. § 355, the taxpayers received a taxable dividend from Guy's Oil in the form of the shares of the new corporation. Section 301 of the Code requires that all corporate dividends be included in the shareholder's gross income; and § 316 defines dividend as any distribution of corporate property made by a corporation to its shareholders out of post-February 28, 1913, earnings. The Supreme Court has held that the meaning of these two sections is that any distribution of property by a corporation to its shareholders out of accumulated earnings is taxable as ordinary income to the shareholders, unless a specific nonrecognition section is applicable. *Commissioner of Internal Revenue v. Gordon*, 391 U.S. 83, 88–90, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968). Internal Revenue Code § 355 is the sole exception, whereby a corporate spin off may receive tax-free treatment. *Bittker*, supra, at ¶ 13.13 at 13–47. Therefore, the sole issue before this Court is whether, as a matter of law, the spin off effected by Guy's Oil satisfied the requirements of I.R.C. § 355.

A brief discussion of the statutory history and purpose of § 355 will be helpful in determining whether the requirements of the section were satisfied in the instant transactions. Congress first permitted tax-free spin offs in the Revenue Act of 1924, which allowed a corporation to spin off a subsidiary without any tax consequences if two conditions were present: (1) immediately after the spin off, the shareholders of the distributing corporation were in control of the controlled corporation (i. e., the subsidiary); and (2) the controlled corporation was distributed to the shareholders as part of a plan of reorganization. A major drawback of this provision from the Govern-

ment's point of view was that it permitted avoidance of the tax on dividend income on a grand scale. The distributing corporation could transfer excess funds or liquid assets to a new corporation and then distribute the stock of that new corporation to the shareholders of the distributing corporation, who would incur no income tax liability from the transfer. The shareholders could then liquidate the new corporation, and they would be taxed on the 50% capital gains tax formula on that transaction. The practical effect would be the same as if the corporation had paid a cash dividend directly to its shareholders, but the tax on the sale of the controlled corporation's assets would be only one half as great as if the distributing corporation had merely paid a cash dividend.

This problem was eliminated in *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), where the Court engrafted onto the specifics of the statute an additional requirement that the spin off serve some corporate purpose other than the reduction of dividend tax liability. *Id.* at 469, 55 S.Ct. 266. However, prior to the Supreme Court's decision in *Gregory*, Congress, aware of the pitfalls of permitting tax-free spin offs, eliminated altogether any provision for a tax-free spin off in the Revenue Act of 1934. Then in 1951 the Internal Revenue Code of 1939 was amended to provide, in § 112(b)(11), for the tax-free spin off of common stock of a subsidiary if: (1) the spin off was carried out pursuant to a plan of reorganization; (2) it was not contemplated that either the distributing or the controlled corporation would go out of business; and (3) the reorganization was not a device for the distribution of earnings and profits. Finally, this section was replaced three years later by the present § 355, which is set out in full in the appendix. Under this new section, it is not required that the spin off be part of a plan of reorganization.

The most complete statement of the purpose of § 355 was given by the Ninth Circuit Court of Appeals in *Commissioner of Internal Revenue v. Wilson*, 353 F.2d 184, 186 (9th Cir. 1965):

"Its purpose and the purpose of its predecessors is to give to stockholders in a corporation controlled by them the privilege of separating or 'spinning off' from their corporation a part of its assets and activities and lodging the separated part in another corporation which is controlled by the same stockholders. Since, after the spin-off, the real owners of the assets are the same persons who owned them before, Congress has been willing that these real owners should be allowed, without penalty, to have their real ownership divided into smaller articifical entities than the single original corporation, if the real owners decide that such a division would be desirable. Congress early learned, however, that shareholders would select the part of the assets of an original corporation which could most readily be converted into cash or its equivalent, spin off those parts into the second corporation, distribute the stock in that corporation to themselves, and thus have available for sale and capital gains tax treatment the stock in that corporation, though in fact what they sold represented accumulated earnings of the original corporation, which earnings, if they had been paid directly to the shareholders of the original corporation, would have been fully taxable to them as dividend income."

While this statutory purpose is helpful in analyzing the transaction in the present case, the Court must also be cognizant of the Supreme Court's admonition that the precise wording of the statute must prevail over the court's sense of what Congress might have done had it been presented with any particular set of facts:

"The requirements of the section [355] are detailed and specific, and must be applied with precision. It is no doubt true, as the Second Circuit emphasized, that the general purpose of the section was to distinguish corporate fission from the distribution of earnings and profits.

However, although a court may have reference to this purpose when there is a genuine question as to the meaning of one of the requirements Congress has imposed, a court is not free to disregard requirements simply because it considers them redundant or unsuited to achieving the general purpose in a particular case. Congress has abundant power to provide that a corporation wishing to spin off a subsidiary must, however bona fide its intentions, conform the details of a distribution to a particular set of rules." *Commissioner of Internal Revenue v. Gordon, supra*, 391 U.S. at 91–94, 88 S.Ct. at 1522.

In other words, because § 355 provides an exemption from a general taxation statute, it must be strictly construed. *Curtis v. United States*, 336 F.2d 714, 721 (6th Cir. 1964).

In the context of the present case, § 355 requires that the taxpayers establish the following elements: (1) the distributing corporation (Guy's Oil) distributed to its shareholders shares of a corporation (Gada Realty and Guy's, Inc.) which was controlled by the distributing corporation immediately prior to the distribution; (2) the distributing corporation distributed either all of the stock it held in the controlled corporation or an amount sufficient to constitute control; (3) both the distributing corporation and the controlled corporation were engaged in the active conduct of a trade or business immediately after the distribution; (4) the trade or business of each was actively conducted throughout the 5 year period ending on the date of distribution; (5) there existed a valid business purpose for the distribution; and (6) the distribution was not used principally as a device for the distribution of the earnings and profits of either the distributing corporation or the controlled corporation.[1] If the taxpayers fail to prove any one of these elements, the spin off must be denied tax-free status. *Commissioner of Internal Revenue v. Gordon, supra*, 391 U.S. at 94, 88 S.Ct. 1517. The Court will examine each of these requirements *seriatim*.

---

1. There are other limitations specified in the statute which do not pertain to the particular facts of the case at bar.

The I.R.S. has argued that the first requirement was not satisfied in this case because the shares of Gada Realty and Guy's, Inc. were issued directly to the taxpayers. Thus, the argument goes, Guy's Oil (the distributing corporation) never controlled the corporations whose shares were distributed. Though mindful of the Supreme Court's instruction to construe § 355 narrowly, the Court finds that the interpretation offered by the I.R.S. parses the statute too finely. It is conceded by the I.R.S. that this first requirement would have been met if the stock of the two new corporations had been issued to Guy's Oil in the first instance, and thereafter had been distributed to the taxpayers. What occurred in the present case was functionally the same thing: a portion of the existing corporation was spun off into two new corporations, the stock of which was transferred directly to the shareholders of the original corporation. To insist that the stock be first issued to the distributing corporation would be to require an empty exercise and would simply exalt form over substance. The Court, therefore, holds that where a new corporation is created through the transfer of assets of the distributing corporation to the new corporation and the shares of the new corporation are issued directly to the shareholders of the distributing corporation, rather than to the distributing corporation itself, the distributing corporation has effectively distributed to its shareholders the stock of a corporation which it controlled prior to the distribution, within the meaning of § 355.[2]

The second requirement—that the distributing corporation distribute all of the stock it holds in the controlled corporation or an amount constituting control—is clearly met in this case. When Gada Realty and Guy's, Inc. were incorporated all outstanding shares of both corporations were immediately issued to the shareholders of Guy's Oil, and the corporate entity, Guy's Oil, retained no beneficial interest in either of the two new corporations.

The active business requirement merits more detailed discussion. While the statute requires that both the distributing and the controlled corporation be engaged in the active conduct of a trade or business immediately after the distribution, nowhere in the statute is "active trade or business" defined. However, Treasury Regulation § 1.355–1(c) provides:

". . . a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses."

Another helpful formulation comes from a landmark case in this area:

"It is our view that in order to be an active trade or business under § 355 a corporation must engage in entrepreneurial endeavors of such a nature and to such an extent as to qualitatively distinguish its operations from mere investments. Moreover, there should be objective indicia of such corporate operations." *Rafferty v. Commissioner of Internal Revenue*, 452 F.2d 767, 772 (1st Cir. 1971), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972).

Applying the foregoing definitions to the facts of the present case, the Court

---

**2.** This conclusion is buttressed by the holding of the Second Circuit in *Bonsall v. Commissioner of Internal Revenue*, 317 F.2d 61 (2d Cir. 1963). In that case, as in the present one, the shares of the new corporation were issued directly to the shareholders rather than being issued to the distributing corporation and then being transferred to the shareholders. The court there held that the transaction failed to satisfy a different provision, namely, the active business requirement of § 355. *Id.* at 64. However, the court made no reference to the fact that the distributing corporation never physically controlled the shares of the new corporation. This may be read as an implicit ruling that the control requirement was met even though the distributing corporation never actually owned the shares of the new corporation. *Id.* at 64.

finds that both Guy's Oil and Guy's, Inc. were engaged in the active conduct of a trade or business immediately after the distribution of the stock of the new corporations. Clearly the business of Guy's Oil, the operation of a full service gasoline station, would qualify under any definition of active trade or business. Indeed, the I.R.S. in this case did not even argue to the contrary.

With respect to Guy's, Inc., the I.R.S. urges that the fact that certain aspects of its business were performed by Guy's Oil precludes a finding that it was engaged in the active conduct of a trade or business. Immediately after the incorporation Guy's Oil leased delivery trucks to Guy's, Inc., paid the salaries of its drivers, and billed and collected payments due from the fuel oil customers. While the fact that these activities were carried out by Guy's Oil is relevant, it is not dispositive on whether Guy's, Inc. was engaged in the active conduct of a trade or business. Professor Bittker, in analyzing the case law on this point, states that the two most important criteria in determining whether a particular enterprise consists of one or two businesses are the geographical situs of the business activities and the nature of those activities. Bittker, *supra*, ¶ 13.04 at 13–17. For example, in *Marne S. Wilson*, 42 T.C. 914, *rev'd on other grounds*, 353 F.2d 184 (9th Cir. 1965) (reversal due to lack of business purpose for the spin off), the Tax Court held that the credit department of a retail furniture store was a separate business from the store itself even though there was unity of location, personnel, records, management and advertising. The rationale is that the two businesses performed different functions. See also, *Hanson v. United States*, 338 F.Supp. 602, 611 (D. Montana 1971). In the same manner, the Court is persuaded that the fuel oil business of Guy's, Inc. constituted a separate business function from the service station business of Guy's

Oil, in spite of the number of services which were temporarily performed by the latter corporation for the former.

██  A number of factors requires the Court to reach the opposite conclusion with respect to Gada Realty. First, the evidence adduced at trial indicated that, aside from the rentals received from its sister corporations, the income of Gada Realty was insignificant.[3] That a corporation makes only a small amount of money is some evidence that it is not a separate active business. *Blaschka v. United States*, 393 F.2d 983, 990, 184 Ct.Cl. 264 (1968).[4] Second, Gada Realty lacks the indicia of corporate endeavors. *Rafferty v. Commissioner of Internal Revenue, supra*, 452 F.2d at 772. It employed no individuals, and its real function was to serve as a corporate holding shell designed to receive the rentals from its sister corporations and pay the expenses incident to the ownership of the real property, all of which was administered by Mildred Gada in her capacity as secretary of the corporation.

The nature of the business of Gada Realty militates against a finding that the corporation was actively engaged in a trade or business. As noted above, virtually all of the real estate owned by the corporation was leased to one of its sister corporations. Treasury Regulation § 1.355–1(c)(2) specifically provides that the concept of active trade or business does not include ". . . the ownership and operation of land or buildings all or substantially all of which are used and occupied by the owner in the operation of a trade or business." Examples (3) and (4) of Treasury Regulation § 1.355–1(d) further amplify the meaning of the regulation. Example (3) concerns a bank which owns an 11 story office building, the ground floor of which is occupied by the bank in the conduct of its banking business. The remaining 10 floors are rented by the real estate department of

---

**3.** Although the plaintiffs, who bear the burden of proof in this case, failed to introduce any specific evidence relating to the source of the corporation's earnings, the Gadas' accountant conceded at trial that the income received from outside sources was very small.

**4.** Of course, a small income is not by itself dispositive on this issue. *Hanson v. United States, supra*, 338 F.Supp. at 612.

the bank to outside tenants. Example (4) presents the case of a bank which owns a two story building, the ground floor and one half of the second floor being utilized by the bank for its own purposes. The remainder of the second floor is rented to outsiders. The regulation illustration states that the rental activity of the bank in Example (3) would constitute a separate business, but the rental activity of the bank in Example (4) is merely incidental to its banking business and does not constitute a separate business. The evidence presented to the Court clearly indicates that the rental activity in the present case more closely resembles Example (4), than Example (3).

Professor Bittker has noted that where, as here, the rental income from outside parties is insignificant, courts tend to hold that the occupancy of real estate by the original business is insufficient to constitute an active trade or business. Bittker, *supra* ¶ 13.04 at p. 13–21. *See e. g. Appleby v. Commissioner*, 35 T.C. 755 (1961), *aff'd per curiam* 296 F.2d 925 (3d Cir. 1961), *cert. den.* 370 U.S. 910, 82 S.Ct. 1256, 8 L.Ed.2d 404 (1962); *Hanson v. United States, supra*, 338 F.Supp. at 609. *See also* Rev.Rul. 57–464. The Second Circuit enunciated the rationale behind these holdings:

> "It is clear that careful scrutiny of purported 'real-estate rental' businesses is necessary to prevent evasion of the purposes of the statute. The possibility of the shareholders abstracting accumulated earnings at capital gains rates is present whenever a corporation owns its own factory or office building. Under taxpayers' interpretation, all that need be done is to transfer the building to a new corporation and distribute the stock received in return. The shareholders would then be free to sell their stock and pay a capital gains rate on the proceeds while the corporation can rent or purchase another building and reduce its accumulated earnings." *Bonsall v. C.I.R., supra*, 317 F.2d at 65.

*See also Parshelsky's Estate v. C.I.R.*, 303 F.2d 14, 22 (2d Cir. 1962), where the court held that acting as a lessor to a related corporation would constitute an active business under § 112(b)(11) of the 1939 Internal Revenue Code, but would not qualify under the new § 355. The Court therefore finds that Gada Realty was not engaged in the conduct of an active trade or business immediately after the issuance of the stock to the taxpayers; rather the rental activity was merely incidental to the operation of the other two businesses.

The fourth requirement of § 355 is that the trade or business of both the distributing corporation and the controlled corporation have been actively conducted during the 5 year period preceding the date of distribution. The evidence at trial indicated that the nature, both qualitatively and quantitatively, of all three aspects of the Gada enterprise did not change in any material manner during the 5 year period preceding the date of issuance of the stock to the taxpayers. Consequently, the holding of the Court on the third requirement is dispositive of this issue; the Court accordingly finds that the fuel oil business of Guy's, Inc. and the gasoline service station business of Guy's Oil were both actively conducted during the 5 year period, but that no active realty business was conducted during said period.

The fifth requirement, judicially engrafted onto the statute by the Supreme Court in *Gregory v. Helvering, supra*, 293 U.S. at 469, 55 S.Ct. 266, is that there be a valid business purpose, unrelated to tax avoidance, for the spin off. The Second Circuit has interpreted this requirement as imposing a twofold test: (1) there must be a valid business purpose to support the division of the corporate entity into smaller units and (2) there must be some business or shareholder purpose for transferring the stock of the new corporations directly to the shareholders rather than having the parent corporation retain that stock. *Parshelsky's Estate v. C.I.R., supra*, 303 F.2d at 20 (construing the statutory predecessor to § 355); *Bonsall v. C.I.R., supra*, 317 F.2d at 65. *See also Hanson v. United States, supra*, 338 F.Supp. at 613. The taxpayers in the instant case have advanced two separate reasons for the spin off: (1) to insulate the

corporate assets from liability should there occur future gasoline explosions similar to that which occurred in 1955[5] and (2) to effect a clear division of responsibility between their son, Richard Gada, and their son-in-law, James Wells, for the operation of the various aspects of the enterprise.[6]

■ In analyzing the corporate purpose for the spin off, the Court recognizes that it would be unfair to deny the spin off tax-free status, unless the spin off is determined to have been, in retrospect, the *best* method of achieving the goal used to justify the spin off. *See Hanson v. United States, supra,* 338 F.Supp. at 613. Nevertheless, the Court must not blindly accept as valid any corporate purpose proffered by the taxpayer, but instead must scrutinize the rea-

sons offered to determine whether there is any possibility that the spin off *could* achieve the stated purpose. Thus, the Second Circuit, in construing the statutory predecessor of § 355, admonished;

". . . Congress intended to limit the tax exemption to those spin-offs where the taxpayer had corporate or shareholder purposes such as would motivate a *reasonable* businessman to effect a spin-off. Therefore, the court must first ascertain the taxpayer's corporate and shareholder purposes and then *evaluate their validity on such an objective basis.*" *Parshelsky's Estate v. C.I.R., supra,* 303 F.2d at 20. (Emphasis supplied).

■ The Court finds that the first reason, namely, the shielding of assets from

---

5. The I.R.S. contends that this purpose cannot be considered by the Court, because of an alleged variance between the evidence preferred at trial and the statements contained in the claims for refunds filed with the I.R.S. I.R.C. § 7422 makes the filing of a claim with the I.R.S. a jurisdictional prerequisite to the bringing of a suit for refund. *Angelus Milling Co. v. Commissioner of Internal Revenue,* 325 U.S. 293, 295, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945); *Scovill Manufacturing Company v. Fitzpatrick,* 215 F.2d 567, 569 (2d Cir. 1954). Additionally, Treasury Regulation, Procedure and Administration, § 301.642–2 requires that the claim specify "each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." While the taxpayer may not advance one claim before the I.R.S. and then rely upon an entirely different ground in a suit for refund, *Carmack v. Scofield,* 201 F.2d 360, 362 (5th Cir. 1953), all that is required is that the taxpayer set forth facts sufficient to enable the I.R.S. to make an intelligent review of his claim. *Scovill Manufacturing Company v. Fitzpatrick, supra,* at 569; *Keneipp v. United States,* 87 U.S.App.D.C. 242, 246, 184 F.2d 263, 267 (1950). Therefore, not every minor variation between the original claim and the complaint in the civil suit is fatal to recovery. *Cities Service Company v. United States,* 316 F.Supp. 61, 73 (S.D.N.Y.1970).

The claims for refund submitted by the taxpayers in the present case were sufficient to permit the I.R.S. to conduct an intelligent review. On the I.R.S. form, Gaetano and Mildred Gada listed as the reason for their claim for refund:

"Upon audit, dividend income was increased to reflect the distributive pro rata share of certain assets of Guy's Oil Service Station, Inc. in a spin off into two additional corporations, Guy's Inc. and Gada Realty Company.

The agent and the conferee refused to recognize the nontaxable reorganization under Section 355 of I.R.C. and the taxpayer files this claim to contest this decision and claims refund of overpayment of tax of $64,373.66 plus interest from the due date of the return."

The reasons offered by the other taxpayers were identical, except for the amount of overpayment. The fact that the particular business reason for the spin off is not listed is not fatal. Indeed, there clearly is not room on the I.R.S. form to specify with particularity in what manner each requirement of § 355 was met. This is not a case where the taxpayers relied on one theory before the I.R.S. and on a completely different one before the court. *See Real Estate Title Co. v. United States,* 309 U.S. 13, 18, 60 S.Ct. 371, 84 L.Ed. 542 (1940) (taxpayer urged deduction for obsolescence before the I.R.S. and casualty loss deduction in court); *Goelet v. United States,* 266 F.2d 881, 882 (2d Cir. 1959) (taxpayers sought depreciation deduction before the I.R.S. and a deduction for the "premium value" of their lease in court). The present taxpayers, before the I.R.S. and before this Court, have been consistent in their claim that the deficiency was improperly assessed because of the operation of § 355. That is all that is required; the taxpayers did not have to specify in the claim for refund the business reason for the spin off.

6. Even if it is asserted that this reason would serve a "personal" rather than a "business" interest, it is clear that the court must consider the personal interests of the taxpayers in effecting a spin off. *Parshelsky's Estate v. C.I.R., supra,* 303 F.2d at 19; *Rafferty v. C.I.R., supra,* 452 at 770; *Hanson v. United States, supra,* 338 F.Supp. at 613.

possible liability claims, was not the motivating force behind the spin off in this case. The problem with stored gasoline percolating underground onto property adjacent to the service station had arisen in 1955, and the related litigation had been settled in 1959. The Court finds that if the Gadas' real motivation had been to shield a portion of the business assets from potential future liability, they would have taken steps to do so before the lapse of 10 years after the litigation had been settled. Moreover, even if the Court were to find that this was in fact the reason behind the corporate division, it still cannot support the transfer of the stock of the new corporations to the shareholders. That is, the goal of shielding assets from liability would be fully achieved through the creation of new corporations owned by the existing corporation; this goal would not be furthered by then transferring the stock of the new corporations to the stockholders. In a case where a similar reason was offered to justify the spin off, the court ruled:

> "[T]he real estate could have been safeguarded from the creditors of the wholesale business merely by having Parshelsky Brothers transfer the wholesale business to a subsidiary corporation and retain the real estate. In light of the tax-avoidance possibilities which a spin-off provides, there must be non-tax reasons not only for the separation of the two businesses but also for direct ownership of both by the shareholders." *Parshelsky's Estate v. C.I.R.*, *supra*, at 20. (Footnote omitted).

The second reason proferred by the taxpayers for the division of Guy's Oil is similarly unpersuasive. The method in which the two new corporations were spun off from Guy's Oil was in fact antithetical to the stated purposed of avoiding potential conflict between Richard Gada and James Wells. Since the shares of the new corporation were issued *pro rata* in accordance with the shareholdings of the taxpayers in Guy's Oil and since the officers of Guy's Oil also served as the officers of the new corporations, control of all three corporations remained in Gaetano and Mildred Gada. If the taxpayers' true purpose had been to give Richard control over one business and James control over the other, the way to accomplish this would have been an uneven distribution of stock in the new corporations. *See* Rev.Rul. 69–460, 1969–2 C.B. 51. The manner in which the spin off was actually effected in the present case did nothing at all to alter the control of the corporate enterprise. Additionally, even if it is assumed that this purpose was in fact advanced by the division of the enterprise into smaller units, there was no need to distribute the stock to the shareholders. The responsibility for the various aspects of the enterprise could have been rearranged by setting up the new corporations as subsidiaries of Guy's Oil and installing Richard as president of the service station and James as president of the fuel oil delivery business. There was absolutely no corporate or shareholder benefit, except for tax avoidance, in distributing the stock to the shareholders. The Court thus finds that the division and distribution of Guy's Oil served no valid corporate or shareholder purpose.

■ The final requirement of § 355 is that the transaction must not be used principally as a device for the distribution of the earnings and profits of either the distributing or the controlled corporation. The Court finds that the real motivation behind the spin off was to facilitate the sale of a part of the enterprise, in the event that that should prove necessary in light of Gaetano Gada's failing health. This purpose could have been completely achieved without the spin off, however. Guy's Oil could have continued as a single enterprise and then, if it became necessary, it could have sold the fuel oil business or the real estate and transferred the proceeds of the sale to its shareholders as a dividend. The only possible advantage to spinning off the new corporations prior to the sale is the avoidance of the corporate dividend tax, which is the very result that the limitations of § 355 are meant to prevent.

■ The fact that the taxpayers, after effecting the spin off, have never taken

advantage of the tax evasion potential by selling off the assets of one of the new corporations does not prove that the spin off was not in fact a device for the distribution of earnings and profits. *Whitman, supra*, at 1246. The spin off in 1969 created the possibility of a "bail out," which possibility still exists at the present time. In redesigning the corporate structure, the taxpayers spun off the two aspects of their enterprise which could be most easily liquidated. They knew from their negotiations with potential buyers that a market existed for the fuel oil delivery business, and it is common knowledge that real estate is readily sold. *See Rafferty v. C.I.R., supra*, 452 F.2d at 771.

By forming the new corporations and issuing the stock to themselves, the taxpayers are now in a position to sell the assets of either of the two new corporations. The practical effect of such a transaction would be the same as if Guy's Oil had merely paid a cash dividend. However, the tax consequences would differ greatly. Had Guy's Oil declared a cash dividend in 1969 it would have been taxed at the rate of ordinary income, but a sale of the assets of the newly formed corporations would be taxed at the capital gains rate, which is one half the ordinary rate. The net effect of the spin off then would be to reduce the taxpayers' income tax liability on this transaction by one half. This is the very tax avoidance potential which § 355 was designed to eliminate. The Court therefore concludes that the spin off of Gada Realty and Guy's, Inc. was a device for the distribution of the earnings and profits of the Gada enterprise.

Having found that Gada Realty did not meet the active business requirements of § 355, that there existed no demonstrable valid corporate or shareholder purpose for the transactions, and that the spin off represents a device to siphon off and distribute earnings and profits to be taxed at a capital gains level, the Court denies in all respects the claims for refund of each of the taxpayers.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court, pursuant to Rule 52(a), Fed.R.Civ.P.

SO ORDERED.

## APPENDIX

"§ 355. Distribution of stock and securities of a controlled corporation

(a) Effect on distributees.—

(1) General rule.—If—

(A) a corporation (referred to in this section as the 'distributing corporation')—

(i) distributes to a shareholder, with respect to its stock, or

(ii) distributes to a security holder, in exchange for its securities,

solely stock or securities of a corporation (referred to in this section as 'controlled corporation') which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary [or his delegate] that the retention by the distributing corporation of stock (or stock and securities)

in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) Non pro rata distributions, etc.—Paragraph (1) shall be applied without regard to the following:

(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

(B) whether or not the shareholder surrenders stock in the distributing corporation, and

(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368(a)(1)(D)).

(3) Limitation.—Paragraph (1) shall not apply if—

(A) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or

(B) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.

for purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such stock and in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

(4) Cross reference.—

For treatment of the distribution if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

(b) Requirements as to active business.—

(1) In general.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) Definition.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions

combined with acquisitions before the beginning of such period.

Aug. 16, 1954, c. 736, 68A Stat. 113."