COMMISSIONER OF INTERNAL REVENUE *v.*
GORDON ET UX.

No. 760.   Argued April 4, 1968.—Decided May 20, 1968.*

---

*Together with No. 781, *Baan et ux.* v. *Commissioner of Internal
Revenue,* on certiorari to the United States Court of Appeals for
the Ninth Circuit.

84

*Solicitor General Griswold* argued the cause for petitioner in No. 760 and for respondent in No. 781. With him on the briefs were *Assistant Attorney General Rogovin, Harris Weinstein, Gilbert E. Andrews,* and *Martin T. Goldblum.*

*Harry R. Horrow* argued the cause for respondents in No. 760 and for petitioners in No. 781. With him on the briefs were *Francis N. Marshall* and *Stephen J. Martin.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

These cases, involving the interpretation of § 355 of the Internal Revenue Code of 1954, have an appropriately complex history.

American Telephone and Telegraph Company (hereafter A. T. & T.) conducts its local communications business through corporate subsidiaries. Prior to July 1, 1961, communications services in California, Oregon, Washington, and Idaho were provided by Pacific Telephone and Telegraph Company (hereafter Pacific). A. T. & T. held about 90% of the common stock of Pacific at all relevant times. The remainder was widely distributed.

Early in 1961, it was decided to divide Pacific into two separate corporate subsidiaries of A. T. & T. The plan was to create a new corporation, Pacific Northwest Bell Telephone Company (hereafter Northwest) to conduct telephone business in Oregon, Washington, and Idaho, leaving the conduct of the California business in the hands of Pacific. To this end, Pacific would transfer all its assets and liabilities in the first three States to Northwest, in return for Northwest common stock and debt paper. Then, Pacific would transfer sufficient Northwest stock to Pacific shareholders to pass control of Northwest to the parent company, A. T. & T.

Pacific had, however, objectives other than fission. It wanted to generate cash to pay off existing liabilities and meet needs for capital, but not to have excess cash left over. It also feared that a simple distribution of the Northwest stock would encounter obstacles under California corporation law.[1] Consequently, the "Plan for Reorganization" submitted to Pacific's shareholders on

---

[1] The record indicates that Pacific's attorneys had advised that if Pacific distributed the Northwest shares without payment of consideration by Pacific's shareholders, the distribution would have to be charged to earned surplus; the attorneys further advised that Pacific had insufficient earned surplus for this purpose, and that if this difficulty were avoided by creation of a reduction surplus, the reduction surplus would, under California law, have to be used first to redeem Pacific's preferred shares.

February 27, 1961, had two special features. It provided that only about 56% of the Northwest common stock would be offered to Pacific shareholders immediately after the creation of Northwest. It also provided that, instead of simply distributing Northwest stock pro rata to shareholders, Pacific would distribute to its shareholders transferable rights entitling their holders to purchase Northwest common from Pacific at an amount to be specified by Pacific's Board of Directors, but expected to be below the fair market value of the Northwest common.

In its February 27 statement to shareholders, Pacific said that it was seeking a ruling from the Internal Revenue Service

> "with respect to the tax status of the rights to purchase which will be issued in connection with the offerings of capital stock of the New Company to shareholders of the Company . . . ."

The statement warned, however, that "[t]axable income to the holders of such shares may result with respect to such rights."

The plan was approved by Pacific's shareholders on March 24, 1961. Pacific transferred its assets and liabilities in Oregon, Washington, and Idaho to Northwest, and ceased business in those States on June 30, 1961. On September 29, 1961, Pacific issued to its common stockholders one right for each outstanding share of Pacific stock. These rights were exercisable until October 20, 1961. Six rights plus a payment of $16 were required to purchase one share of Northwest common. The rights issued in 1961 were sufficient to transfer about 57% of the Northwest stock.

By September 29, 1961, the Internal Revenue Service had ruled that shareholders who sold rights would real-

ize ordinary income in the amount of the sales price, and that shareholders who exercised rights would realize ordinary income in the amount of the difference between $16 paid in and the fair market value, measured as of the date of exercise, of the Northwest common received. The prospectus accompanying the distributed rights informed Pacific shareholders of this ruling.

On June 12, 1963, the remaining 43% of the Northwest stock was offered to Pacific shareholders. This second offering was structured much as the first had been, except that eight rights plus $16 were required to purchase one share of Northwest.

The Gordons, respondents in No. 760, and the Baans, petitioners in No. 781, were minority shareholders of Pacific as of September 29, 1961. In the rights distribution that occurred that day the Gordons received 1,540 rights under the plan. They exercised 1,536 of the rights on October 5, 1961, paying $4,096 to obtain 256 shares of Northwest, at a price of $16 plus six rights per share. The average price of Northwest stock on the American Stock Exchange was $26 per share on October 5. On the same day, the Gordons sold the four odd rights for $6.36. The Baans received 600 rights on September 29, 1961. They exercised them all on October 11, 1961, receiving 100 shares of Northwest in return for their 600 rights and $1,600. On October 11, the agreed fair market value of one Northwest share was $26.94.

In their federal income tax returns for 1961, neither the Gordons nor the Baans reported any income upon the receipt of the rights or upon exercising them to obtain Northwest stock at less than its fair market value. The Gordons also did not report any income on the sale of the four rights. The Commissioner asserted deficiencies against both sets of taxpayers. He contended, in a joint proceeding in the Tax Court, that the taxpayers received

ordinary income in the amount of the difference between the sum they paid in exercising their rights and the fair market value of the Northwest stock received. He contended further that the Gordons realized ordinary income in the amount of $6.36, the sales price, upon the sale of their four odd rights.

The Tax Court upheld the taxpayers' contention that the 1961 distribution of Northwest stock met the requirements of § 355 of the Code, with the result that no gain or loss should be recognized on the receipt by them or their exercise of the rights. The Tax Court held, however, that the Gordons' sale of the four odd rights resulted in ordinary income to them. The Commissioner appealed the *Baan* case to the Court of Appeals for the Ninth Circuit, and the *Gordon* case to the Court of Appeals for the Second Circuit; in the latter, the Gordons cross-appealed. The Ninth Circuit reversed the Tax Court, holding that the spread between $16 and fair market value was taxable as ordinary income to the Baans. The Second Circuit disagreed, sustaining the Tax Court on this point in the *Gordon* case, Judge Friendly dissenting. The Second Circuit went on to hold that the amount received by the Gordons for the four odd rights was taxable as a capital gain rather than as ordinary income, reversing the Tax Court on this point.

Because of the conflict, we granted certiorari. 389 U. S. 1033, 1034. We affirm the decision of the Court of Appeals for the Ninth Circuit, and reverse the decision of the Court of Appeals for the Second Circuit on both points.

Under §§ 301 and 316 of the Code, subject to specific exceptions and qualifications provided in the Code, any distribution of property by a corporation to its shareholders out of accumulated earnings and profits is a divi-

dend taxable to the shareholders as ordinary income.[2] Every distribution of corporate property, again except as otherwise specifically provided, "is made out of earnings and profits to the extent thereof."[3] It is here agreed that on September 28, 1961, Pacific's accumulated earnings and profits were larger in extent than the total amount the Commissioner here contends was a dividend—the difference between the fair market value of all Northwest stock sold in 1961 and the total amount, at $16 per share, paid in by purchasers.

Whether the actual dividend occurs at the moment when valuable rights are distributed or at the moment when their value is realized through sale or exercise, it is clear that when a corporation sells corporate property to stockholders or their assignees at less than its fair market value, thus diminishing the net worth of the corporation, it is engaging in a "distribution of property" as that term is used in § 316.[4] Such a sale thus results in a

---

[2] Section 301 (a) provides as follows:

"Except as otherwise provided in this chapter, a distribution of property (as defined in section 317 (a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c)."

Section 317 (a) provides that "the term 'property' means money, securities, and any other property . . . ." Section 301 (c) provides that the "portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income." Section 316 says that "the term 'dividend' means any distribution of property made by a corporation to its shareholders—(1) out of its earnings and profits accumulated after February 28, 1913, or . . . ."

[3] Section 316 (a) provides in part as follows:

"Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof . . . ."

[4] See, e. g., Choate v. Commissioner, 129 F. 2d 684 (C. A. 2d Cir.). In Palmer v. Commissioner, 302 U. S. 63, 69, this Court said:

"While a sale of corporate assets to stockholders is, in a literal sense, a distribution of its property, such a transaction does not

dividend to shareholders unless some specific exception or qualification applies. In particular, it is here agreed that the spread was taxable to the present taxpayers unless the distribution of Northwest stock by Pacific met the requirements for nonrecognition stated in § 355, or § 354, or § 346 (b) of the Code.[5]  Since the Tax Court

necessarily fall within the statutory definition of a dividend.  For a sale to stockholders may not result in any diminution of its net worth and in that case cannot result in any distribution of its profits.

"On the other hand such a sale, if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend."

In *Palmer,* rights were distributed entitling shareholders to purchase from the corporation shares of stock in another corporation.  Find-. ing that the sales price represented the reasonable value of the shares at the time the corporation committed itself to sell them, this Court found no dividend.  It held that the mere issue of rights was not a dividend.  It has not, however, been authoritatively settled whether an issue of rights to purchase at less than fair market value itself constitutes a dividend, or the dividend occurs only on the actual purchase.  In the present case this need not be decided.

[5] It is important to begin from this premise.  In our view, the Court of Appeals for the Second Circuit erred in its approach to the § 355 problem because it assumed, at the outset, that the Commissioner essentially sought to tax a transaction that brought no "income" to Pacific shareholders.  Whether the shareholders received income, however, cannot in practice be determined in the abstract, before looking at § 355.

Any common shareholder in some sense "owns" a fraction of the assets of the corporation in which he holds stock, including those assets that reflect accumulated corporate earnings.  Earnings are not taxed to the shareholder when they accrue to the corporation, but instead when they are passed to shareholders individually through dividends.  Consequently it does not help to note, as the Second Circuit here did, that the distribution of Northwest stock merely changed the form of ownership that Pacific's shareholders enjoyed and did not increase their wealth.  This is only very

concluded that the requirements of § 355 had been met, it did not reach taxpayers' alternative contentions. Under the disposition that we make here upon the § 355 question, these alternative contentions remain open for further proceedings in the Tax Court.

Section 355 provides that certain distributions of securities of corporations controlled by the distributing corporation do not result in recognized gain or loss to the distributee shareholders.[6] The requirements of the

---

roughly true at best, but in the rough sense in which it is here true, it is true of any dividend. The question is not whether a shareholder ends up with "more" but whether the change in the form of his ownership represents a transfer to him, by the corporation, of assets reflecting its accumulated earnings and profits.

There may be a genuine theoretical difference between a change in form representing a mere corporate fission, separating what the shareholder owns into two smaller but essentially similar parts, and a change in form representing a dividend, separating what a shareholder owns *qua* shareholder from what he owns as an individual. This difference, however, must be defined by objectively workable tests, such as Congress supplied in § 355. Neither the Second Circuit nor the taxpayers have suggested any other way of identifying a true fission.

[6] Sec. 355. Distribution of stock and securities of a controlled corporation.

(a) Effect on distributees.

(1) General rule.

If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, or

(ii) distributes to a security holder, in exchange for its securities, solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the dis-

section are detailed and specific, and must be applied with precision. It is no doubt true, as the Second Circuit emphasized, that the general purpose of the section was to distinguish corporate fission from the distribution of

tributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active business) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368 (c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax, then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) Non pro rata distributions, etc.

Paragraph (1) shall be applied without regard to the following:

(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

(B) whether or not the shareholder surrenders stock in the distributing corporation, and

(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368 (a)(1)(D)).

(3) Limitation.

Paragraph (1) shall not apply if—

(A) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or

(B) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.

For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section,

earnings and profits. However, although a court may have reference to this purpose when there is a genuine question as to the meaning of one of the requirements Congress has imposed, a court is not free to disregard requirements simply because it considers them redundant or unsuited to achieving the general purpose in a particular case. Congress has abundant power to provide that a corporation wishing to spin off a subsidiary

stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such stock and in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

(4) Cross reference.

For treatment of the distribution if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

(b) Requirements as to active business.

(1) In general.

Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) Definition.

For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period

must, however bona fide its intentions, conform the details of a distribution to a particular set of rules.

The Commissioner contends that the 1961 distribution of Northwest stock failed to qualify under § 355 in several respects.[7] We need, however, reach only one. Section 355 (a)(1)(D) requires that, in order to qualify for nonrecognition of gain or loss to shareholders, the distribution must be such that

> "as part of the distribution, the distributing corporation distributes—
>
> "(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the times of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

[7] The Commissioner contends, first, that Pacific did not distribute "solely stock or securities" as required by § 355 (a)(1)(A), because it distributed rights rather than stock. He contends, second, that Pacific did not distribute the Northwest stock "to a shareholder, with respect to its stock" as required by § 355 (a)(1)(A)(i), because it did not distribute the stock to shareholders but sold it to holders of transferable rights, for cash consideration. He contends, third, that Northwest did not meet the quantity requirements of § 355 (a)(1)(D) because it parted with only 57% of the stock in 1961.

Any one of these arguments, if established, would support the result the Commissioner seeks. The Court of Appeals for the Second Circuit perforce rejected all three. The Court of Appeals for the Ninth Circuit accepted all three. We reach only the last.

"(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368 (c), and . . . ."

Section 368 (c) provides in relevant part that

"the term 'control' means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." [8]

On September 28, 1961, the day before the first rights distribution, Pacific owned all of the common stock of Northwest, the only class of securities that company had issued. The 1961 rights offering contemplated transferring, and succeeded in transferring, about 57% of the Northwest common to Pacific shareholders. It therefore could not be clearer that this 1961 distribution did not transfer "all" of the stock of Northwest held by Pacific prior to it, and did not transfer "control" as that term is defined in § 368 (c).

Nevertheless, taxpayers contend, and the Second Circuit agreed, that the requirements of subsection (a)(1)(D) were here met because Pacific distributed the remaining 43% of the Northwest stock in 1963. The court said that the purpose of the subsection "in no way requires

---

[8] In the Tax Court, the Commissioner did not argue that Pacific had failed to meet the requirement that it distribute at least 80% of the Northwest stock, but rested upon his other arguments against applying § 355. When the Tax Court rejected these arguments, the Commissioner raised the 80% question, as well as his other arguments in both Courts of Appeals. Both considered the point on the merits, dividing on it as on the others. Since the general issue of the applicability of § 355 has been in the case since its inception, taxpayers do not contend that the 80% question is not properly before this Court. Since the record leaves no disputed issue of fact with respect to this question, we find it proper to decide it here without reference to a trier of fact.

a single distribution." [9]   The court apparently concluded that so long as it appears, at the time the issue arises, that the parent corporation has in fact distributed all of the stock of the subsidiary, the requirements of § (a)(1)(D)(i) have been satisfied.

We are forced to disagree.   The Code requires that "the distribution" divest the controlling corporation of all of, or 80% control of, the controlled corporation. Clearly, if an initial transfer of less than a controlling interest in the controlled corporation is to be treated for tax purposes as a mere first step in the divestiture of control, it must at least be identifiable as such at the time it is made.   Absent other specific directions from Congress, Code provisions must be interpreted so as to conform to the basic premise of annual tax accounting.[10] It would be wholly inconsistent with this premise to hold that the essential character of a transaction, and its tax impact, should remain not only undeterminable but unfixed for an indefinite and unlimited period in the future, awaiting events that might or might not happen.   This requirement that the character of a transaction be determinable does not mean that the entire divestiture must necessarily occur within a single tax year.   It does, however, mean that if one transaction is to be characterized as a "first step" there must be a binding commitment to take the later steps.[11]

---

[9] 382 F. 2d 499, 507.

[10] See *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, 363–365.

[11] The Commissioner contends that a multistep divestiture presents special problems in preventing bailouts of earnings and profits. The Second Circuit, recognizing such potential problems, held that they can be dealt with under § (a)(1)(B), which provides that nonrecognition shall result only when it appears that

"the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both . . . ."

Congress may, of course, have chosen not to leave problems created by multistep divestitures to specific adjudication under this "device"

Here, it was little more than a fortuity that, by the time suit was brought alleging a deficiency in taxpayers' 1961 returns, Pacific had distributed the remainder of the stock. The plan for reorganization submitted to shareholders in 1961 promised that 56% of that stock would be distributed immediately. The plan went on,

> "It is expected that within about three years after acquiring the stock of the New Company, the Company by one or more offerings will offer for sale the balance of such stock, following the procedures described in the preceding paragraph. The proceeds from such sales will be used by the Company to repay advances then outstanding and for general corporate purposes including expenditures for extensions, additions and improvements to its telephone plant.
>
> "The prices at which the shares of the New Company will be offered pursuant to the offerings referred to . . . will be determined by the Board of Directors of the Company at the time of each offering."

It was further stated that such subsequent distributions would occur "[a]t a time or times related to its [Pacific's] need for new capital." Although there is other language in the plan that might be interpreted as preventing Pacific management from dealing with the Northwest stock in any way inconsistent with eventual sale to Pacific shareholders, there is obviously no promise to sell any particular amount of stock, at any particular time, at any particular price. If the 1961 distribution played a part in what later proved to be a total divestiture of the Northwest stock, it was not, in 1961, either

---

subsection, but to require *both* a unitary divestiture *and* satisfaction of the "device" requirement. Whether § (a)(1)(D) would prohibit or limit a divestiture of control committed from the outset but spread over a series of steps is a problem we need not reach.

a total divestiture or a step in a plan of total divestiture.

Accordingly, we hold that the taxpayers, having exercised rights to purchase shares of Northwest from Pacific in 1961, must recognize ordinary income in that year in the amount of the difference between $16 per share and the fair market value of a share of Northwest common at the moment the rights were exercised.

The second question presented by the petition in No. 760, whether the $6.36 received by taxpayers Gordon upon the sale of four rights was taxable as ordinary income, as a capital gain, or not at all, does not require extended discussion in light of our view upon the first question. Since receipt and exercise of the rights would have produced ordinary income, receipt and sale of the rights, constituting merely an alternative route to realization, also produced income taxable at ordinary rates. *Helvering* v. *Horst*, 311 U. S. 112; *Gibson* v. *Commissioner*, 133 F. 2d 308 (C. A. 2d Cir.).

The judgment of the Court of Appeals for the Second Circuit is reversed. The judgment of the Court of Appeals for the Ninth Circuit is affirmed.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.