Jon Garth MURRAY, et al., Appellants,

v.

Angela Marie BUCHANAN, Treasurer of
the United States, et al.

No. 81–1301.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc Oct. 27, 1982.

Decided Oct. 28, 1983.

Ronald A. Lindsay, Washington, D.C.,
with whom Myra C. Selby, Indianapolis,
Ind., was on the brief, for appellants.

Michael Jay Singer, Atty., Dept. of Justice, Washington, D.C., with whom Stanley
S. Harris, U.S. Atty., Leonard Schaitman,
Atty., Dept. of Justice, Washington, D.C.,
were on the brief, for appellees, Buchanan,
et al. Royce C. Lamberth, Kenneth M.
Raisler and R. Craig Lawrence, Asst. U.S.
Attys., Washington, D.C., also entered appearances for Buchanan, et al.

Stanley M. Brand, General Counsel,
Washington, D.C., with whom Steven R.
Ross, Asst. Counsel, Washington, D.C.,
United States House of Representatives,
was on the brief, for appellees O'Neill and
Ford.

Michael Davidson, Senate Legal Counsel,
Washington, D.C., with whom M. Elizabeth
Culbreth, Deputy Senate Legal Counsel,
Washington, D.C., for Senate and Daniel J.
Popeo, Paul D. Kamenar and Nicholas E.
Calio, Washington, D.C., for Senator Helms,
et al., were on the joint brief, for appellees.

Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., were on the brief,
for amicus curiae urging the case be reversed and remanded for further proceedings.

ON REHEARING *EN BANC*

Before ROBINSON, Chief Judge,
WRIGHT, TAMM, WILKEY, WALD,
MIKVA, EDWARDS, GINSBURG, BORK
and SCALIA, Circuit Judges, and BAZELON and MacKINNON, Senior Circuit
Judges.

Opinion PER CURIAM.

Special concurrence filed by Senior Circuit Judge MacKINNON.

Separate statement filed by Circuit Judge GINSBURG in which Senior Circuit Judge BAZELON concurs.

PER CURIAM:

After argument of this appeal before the court sitting en banc, the Supreme Court decided *Marsh v. Chambers,* —— U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). *Marsh* rejected a first amendment-establishment clause challenge to the Nebraska Legislature's practice of beginning each session with a prayer by a chaplain paid by the state.

On July 18, 1983, the court directed the parties here "to show cause why, in light of ... *Marsh v. Chambers* ..., this appeal should not be dismissed and the district court instructed to vacate its judgment and dismiss the complaint for failure to raise a substantial constitutional question." *See Hagans v. Lavine,* 415 U.S. 528, 536–38, 94 S.Ct. 1372, 1378–80, 39 L.Ed.2d 577 (1974); *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105–06, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933). All parties have now responded to that order.

We have reviewed the parties' presentations, and are persuaded that the complaint in this action retains no vitality. The Supreme Court's decision in *Marsh v. Chambers* is dispositive of appellants' challenge to the public funding of congressional chaplains. The Court answered the question presented in *Marsh* with unmistakable clarity: The "practice of opening each legislative day with a prayer by a chaplain paid by the State [does not] violate[ ] the Establishment Clause of the First Amendment." *Id.* —— U.S. at ——, 103 S.Ct. at 3331. In so ruling, the Court relied heavily on the "unambiguous" history of congressional chaplaincies. *Id.* at —— —— ——, 103 S.Ct. at 3332–36. The practice at issue, the High Court said, has been "unbroken ... for two centuries in the National Congress," *id.* at ——, 103 S.Ct. at 3336, and "ha[d] become part of the fabric of our society." *Id.* at ——, 103 S.Ct. at 3335.

We perceive no tenable basis for a claim that the very congressional practice deliberately traced by the Court in *Marsh* should be subject to further review. Therefore, we dismiss this appeal, vacate the judgment of the district court, and remand the case with instructions to dismiss the complaint for want of a substantial constitutional question.

MacKINNON, Senior Circuit Judge (concurring specially).

The foregoing *en banc* opinion, which I join, dismisses the appeal, vacates the judgment of the district court, 505 F.Supp. 144, and remands the case with instructions to dismiss the complaint for want of a substantial federal question. Reliance is placed on the Supreme Court opinion by Chief Justice Burger in *Marsh v. Chambers,* —— U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which involved the Chaplain of the Nebraska Legislature and was decided after the panel decision in this case. The *en banc* opinion is somewhat at variance with the panel decision, which remanded this case to the district court. In doing so, the panel had held that it was not necessary to consider the extent to which the political question issue involved some consideration of the Establishment Clause and that "[t]his case occasions no need for a [lengthy historical analysis of the political question issue]." Slip op. at 17 n. 23. My views were in disagreement with the majority's refusal to reach the full merits of the political question issue insofar as it necessarily involved some consideration of the Establishment Clause, and as to the need for substantial historical analysis in determining the presence of a political question. *Cf. Marsh v. Chambers, supra.* Accordingly, I dissented from the decision of the panel and filed an opinion. Since it is the practice of this court to vacate panel opinions when the case is placed *en banc,* and since this case involved the Chaplains of Congress and some different constitutional considerations than were present in the Nebraska case, I set forth below extracts from my earlier dissent that provide additional support for

the court's present decision in this case. These reflect in greater detail the constitutional and unique historical base which supports our decision. Also addressed are additional issues, including the federal separation of powers issue that is present in this case, involving Congress, and which was not an issue in *Marsh v. Chambers*. Other matters in my dissent to the original panel decision also point to the recognition of God and religion in the Constitution (slip op. at 5–8), which is a further "tolerable acknowledgment of beliefs widely held among the people of this country." at ——, 103 S.Ct. at 3336.

DISSENT TO PANEL OPINION IN MURRAY
v. BUCHANAN

(No. 81–1301, D.C.Cir., March 9, 1982)

MacKINNON, Circuit Judge (dissenting): [*]

Appellants' claims against the payment of legislative chaplains must be dismissed ... if the issues involved are nonjusticiable within the purview of the political question doctrine. *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 215, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974) .... [This hurdle] is [not] cleared here. Accordingly, in my judgment we should affirm the holding of the District Court.

## I. *The Political Question Doctrine*

As the Supreme Court noted in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962),

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; ... or the impossibility of a court's undertaking independent resolution without expressing

[* The following extracts exclude the discussion of standing which the Supreme Court upheld.]

1. Right Reverend Samuel Provost, elected Chaplain of the Senate, April 25, 1789, 1 Annals of Congress 24.

lack of the respect due coordinate branches of government ....

Both of these criteria are met here.

## A. Textual Commitment

The Constitution textually commits to the Senate and the House of Representatives the exclusive authority to choose their officers and determine their rules of proceedings. It provides that (1) "[t]he House of Representatives shall chuse their Speaker and other officers ...," U.S. Const. art. I, § 2, cl. 5; (2) "[t]he Senate shall chuse their other officers ...," *id.*, art. I, § 3, cl. 5; and (3) "[e]ach house may determine the Rules of its proceedings," *id.*, art. I, § 5, cl. 2. Pursuant to these provisions, when the First Congress met in 1789 after the adoption of the Constitution, the first order of business in the Senate, after the adoption of the procedural rules, was to establish the Office and elect a Chaplain.[1] The House appointed its Chaplain the following week.[2] At some later time both Houses assigned to their chaplains the duty of opening daily sessions of the respective houses with an invocation, and enacted a statute prescribing their respective compensation. 2 U.S.C. §§ 61d, 61d–1, 61d–2, 84–2 (1976 & Supp. IV 1980).

Appellants attack the payments to the chaplains as violating the Constitution and assert that the above quoted provisions of Article I of the Constitution do *not* give Congress the right to spend public funds for such purpose.

That contention assumes a narrow reading of the quoted provisions of Article I that, in my opinion, is not justified. The decision of the Senate and the House to compensate one of their duly elected officers from the legislative appropriation, for performance of his historical duties to Congress, is a judgment made pursuant to and in execution of the powers conferred on the Senate and the House to "chuse their ...

2. Reverend William Linn, appointed Chaplain to Congress on the part of the House, May 1, 1789, 1 Annals of Congress 233.

officers" and "to determine the Rules of [their] proceedings." Under the doctrine of implied federal power, *see McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the enactment of a statute authorizing the expenditure of federal monies for compensation of chaplains represents a legitimate exercise of Congress' incidental power to legislate in furtherance of enumerated constitutional ends. Payment of the chaplains, in short, is clearly concomitant to Congress' constitutionally prescribed right to choose those officers in the first instance. It is therefore an act that is itself *textually committed to Congress by the Constitution.*[3] Appellants' claim thus comes within the political question doctrine and for that reason it is beyond the scope of our review.

The majority asserts that *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), upholds their contention. In *Powell,* the House voted to exclude Representative Adam Clayton Powell from its membership. The House relied upon the authority allegedly vested in it by the Constitution, which provides that "[e]ach House shall be the Judge of the . . . Qualifications of its own Members." Art. I, sec. 5. Powell contended that he was excluded for failure to comply with eligibility requirements that exceeded those prescribed by the Constitution and his exclusion was therefore beyond the authority conferred by the exclusion clause. The Supreme Court considered the political question defenses offered by the Government in support of its contention that the issue was nonjusticiable,

as being inextricably connected to a matter textually committed to Congress by the Constitution. Following a lengthy analysis, the Court decided that the constitutional provision prescribing eligibility requirements for members of the House set forth the exclusive requirements and that in expelling Powell for additional reasons the House had exceeded its textual mandate. The political question doctrine was therefore inapplicable.

The majority here maintains that since the provision that each House could judge the qualifications of its members, Art. 1, sec. 5, cl. 1, was held to be subject to judicial examination in *Powell* in the face of the political question doctrine, so too must be the clauses at issue herein. Maj. op. at 16. This conclusory reasoning bespeaks a fundamental failure to grasp the principles of political question analysis. As is clearly apparent from *Powell,* it is impossible to determine whether the political question doctrine applies in a given instance without examining the merits of the underlying claim at issue. *See* Jayson, *Annotated Const. of the United States* 668 (U.S. Gov. Printing Office 1972) ("[[a]s a result of *Powell*], . . . the political question consideration is now one on the merits rather than a decision not to decide").[4] In other words, it is not possible to determine whether the compensation of legislative chaplains is protected from judicial review by the "textual commitment" criteria of the political question doctrine without examining the merits of the Government's claim that that compensation is textually committed.[5] As is

---

3. For an *identical* analysis undertaken by Congress on the textual commitment of chaplains to the armed forces, see note 11 *infra.*

4. The majority seems at first to be in complete agreement with this conclusion, as it states,

> This court has observed that the general rule that "there is no warrant for the judiciary to interfere in the internal procedures of Congress" applies "where constitutional rights are not violated." *Exxon Corp. v. FTC,* 589 F.2d 582, 590 (D.C.Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979).

Maj. op. at 14 n. 21. As this quote indicates, the merits of an alleged constitutional violation

must be considered before the political question doctrine may be addressed.

Having supported the "merits first" type of analysis, however, the majority fails to go the next step, *viz.,* to consider the merits to the extent required. Indeed, it notes, "[w]e . . . do not reach the merits, and intimate no view as to whether the challenged expenditures violate the establishment clause . . . ." Maj. op. at 1–2. This failure constitutes error that wholly deflates the majority's political question analysis.

5. The majority asserts: "[t]he dissenting opinion concentrates on 'the merits of the underlying claim at issue,' on the novel theory that to decide whether a question is 'political' a court

demonstrated above, such examination shows that such compensation *is* textually committed. Thus, under the standard applied in *Powell,* judicial scrutiny of the compensation practice *is* protected by the political question doctrine.[6]

The correctness of this conclusion clearly appears when the textual commitment is examined from another angle. The ability of the houses of Congress to appoint chaplains, whose sole public duty throughout history has been to give daily invocations, is implicitly authorized by the officer selection and rules proceedings clauses cited above.

What the Senate has done in having a chaplain amounts to nothing more than a *recognition* of God and religion that is similar to their recognition elsewhere in the Constitution. Article II, section 1 recognizes God and religion by providing that the President of the United States may assure the nation that he will carry out his great duty and obligation to uphold the Constitution of the United States by taking an *"oath"* to do so. An "Oath" is a "formal calling upon God or a god to witness to the truth of what one says or to witness that one sincerely intends to do what one says." *Webster's New Collegiate Dictionary* 790 (1976).[7] Thus, the

must first consider the case 'on the merits'. If the theory of the dissent is correct, then indeed there is no political question doctrine, there is only an obfuscating label pinned to a decision on the merits." Maj. op. at 12 n. 17. This misstates the point made here. It is not that invocation of the political question doctrine may only allow a complete examination of the merits of the case as a whole. Rather, it is that the political question doctrine cannot be applied until there is a full examination of the Government's claim that the compensation of legislative chaplains is textually committed. To proceed without resolving this underlying claim makes it *impossible* to gauge the application of the political question doctrine in any sensible fashion whatsoever.

6. The majority asserts that the above discussion of the merits of the textual commitment claim is premature on the ground that "if ... [the] ... question is not political, the merits should be addressed initially by a court of first instance, not a court of review." Maj. op. at 13 n. 17.

However, as the majority states, appellants are complaining of "expending and receiving funds under [designated] statutes that authorize payment of salaries and certain expenses for the chaplains of the Senate and House of Representatives" and that "appellants [are] ... taxpayers," "that the challenged statutes are an exercise by Congress of the spending power under article I, section 8 ...", and that the "total expenditure under these statutes is approximately $80,000 annually" are all *"undisputed"* facts. Maj. op. at 2–3.

Thus, the facts necessary to a determination of the political question issue emerge from the Constitution, the decisions of the Supreme Court and the "undisputed" facts in the pleadings. There are no credibility issues and on such record this court is as capable as a trial court of deciding a constitutional issue. There is no necessity to treat the case like a yo-yo and not decide the issue that is before us when the essential facts are "undisputed." The Su-

preme Court, speaking through Justice Harlan, applied this wisdom in *Commissioner v. Gordon,* 391 U.S. 83, 95 n. 8, 88 S.Ct. 1517, 1524 n. 8, 20 L.Ed.2d 448 (1967) ("[s]ince the record leaves no *disputed* issue of fact with respect to [the] question [to be decided herein on the merits], we find it proper to decide it here without reference to a trier of fact.") (emphasis added). *King v. Commissioner of Internal Revenue,* 458 F.2d 245, 249 (6th Cir.1972), also dealt with an alternative issue that was not reached by the trier of facts and Judge Peck's opinion held "a remand is unnecessary if all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court, or if all the facts relied upon to support the judgment are in the record and are undisputed ...." *See also Texas Co. v. R. O'Brien Co.,* 242 F.2d 526, 529 (1st Cir.1957) ("if all subsidiary facts ... stand admitted, there can be no need of sending the case back"); *McComb v. Utica Knitting Co.,* 164 F.2d 670, 674 (2d Cir.1947) ("as ... the evidence is entirely documentary, no issue of witness credibility arises; therefore, we can pass on the facts as well as the trial judge [citing cases] and need not remand for a finding by him"); *Aetna Life Ins. Co. v. Meyn,* 134 F.2d 246, 249 (8th Cir.1943) (where "controlling facts are not in dispute" and "questions of law" were dispositive, the Court of Appeals was "at liberty to decide the case on its merits" even though trial court had not made findings of fact).

7. This meaning of an oath has been applied repeatedly. *See, e.g., Lackey v. Mesa Petroleum,* 90 N.M. 65, 559 P.2d 1192, 1193 (App. 1976) (an appeal by a person to God); *In re Rice,* 35 Ill.App.2d 79, 181 N.E.2d 742 (1962) (a solemn appeal to God); *In re Heath,* 40 Kan. 333, 19 P. 926, 927 (1888) (a declaration or promise made by calling on God to witness what is said); *State v. Jones,* 28 Idaho 428, 154 P. 378 (1916) (solemn appeal to the Supreme Being).

Constitution explicitly recognizes God and religion by a textual commitment whereby the President is given the option of invoking God in his binding undertaking to carry on his most solemn governmental duty, *i.e.*, to support the Constitution. That the President's undertakings may also be by "affirmation" implements the "free exercise of religion" also guaranteed by the First Amendment.

Nor is this the only constitutional provision recognizing God and religion. The Constitution also provides:

> The senators and representatives before mentioned, and the members of the several state legislatures, and all executive and judicial officers, both of the United States and of the several states, shall be bound by *oath* or affirmation, to support this Constitution, but no religious test shall ever be required as a qualification to any office or public trust under the United States . . .

U.S. Const. art. VI (emphasis added). The recognition of God and religion in this provision is of tremendous magnitude, extending as it does to every major governmental office in the nation—state and federal.[8]

In addition Article I, section 3 of the Constitution provides that the Senate shall have the sole power to try all impeachments

---

**8.** In addition, in their inaugural addresses, *all* of our nation's presidents have publicly recognized God and religion. For example, George Washington, who led the colonists to independence, presided throughout the constitutional convention and was elected the first president of the new nation under the Constitution, paid homage to the place of God and religion in the lifeblood of the nation in his First Inaugural Address on April 30, 1789:

> [I]t would be particularly improper to omit in this first official Act, my fervent supplications to that Almighty Being who rules over the Universe, who presides in the Councils of Nations, and whose providential aids can supply every human defect, that his benediction may consecrate to the liberties and happiness of the People of the United States, a Government instituted by themselves for these essential purposes: and may enable every instrument employed in its administration to execute with success, the functions allotted to his charge. In tendering this homage to the Great Author of every public and private good, I assure myself that it expresses your sentiments not less than my own; nor those of my fellow-citizens at large, less than either. No People can be bound to acknowledge and adore the invisible hand, which conducts the Affairs of men more than the People of the United States. Every step, by which they have advanced to the character of an independent nation, seems to have been distinguished by some token of providential agency. And in the important revolution just accomplished in the system of their United Government, the tranquil deliberations and voluntary consent of so many distinct communities, from which the event has resulted, cannot be compared with the means by which most Governments have been established, without some return of pious gratitude along with a humble anticipation of the future blessings which the past seems to presage. These reflections, arising out of the present crisis, have forced themselves too strongly on my mind to be suppressed. You will join with me I trust in thinking that there are none under the influence of which the proceedings of a new and free Government can more auspiciously commence.

J. Fitzpatrick, 30 Writings of Washington 292–93, U.S. Gov't Printing Office, Bicentennial Commission.

George Washington also laid the cornerstone of the Capitol in a Masonic Ceremony in which "the whole congregation joined in awfull[*] prayer." The Columbian Mirror and Alexandria Gazette, September 25, 1793. *"Awfully . . . archaic: with a feeling of awe . . . ." Webster's Third New International Dictionary 152 (1961).

The principal sponsor of the Bill of Rights, Thomas Jefferson, also invoked divine guidance on March 4, 1805 in his inaugural address.

> . . . I shall need, too, the favor of that Being in whose hands we are, who led our fathers, as Israel of old, from their native land and planted them in a country flowing with all the necessaries and comforts of life; who has covered our infancy with His providence and our riper years with His wisdom and power, and to whose goodness I ask you to join in supplications with me that He will so enlighten the minds of your servants, guide their councils, and prosper their measures that whatsoever they do shall result in your good, and shall secure to you the peace, friendship, and approbation of all nations.

*Engel v. Vitale*, 370 U.S. 421, 447 n. 3, 82 S.Ct. 1261, 1275 n. 3, 8 L.Ed.2d 601 (1961) (Stewart, J., dissenting).

For additional examples of the invocation of God and religion by Presidents, see the extracts from the inaugural addresses of John Adams, James Madison, Abraham Lincoln, Grover Cleveland, Woodrow Wilson, Franklin Delano Roosevelt, Dwight Eisenhower, and John Kennedy, in *Vitale, supra,* 370 U.S. at 447–49 n. 3, 82 S.Ct. at 1275–76 n. 3.

and "when sitting for that purpose, they shall be on *oath* or affirmation."

The Constitution thus by very specific textual references recognizes the existence of God, and hence religion, by requiring that all state and federal officers of the United States may be bound by "oath" to support the Constitution. Observation through the years supports a conclusion that 99% of those who assume such responsibilities do so by taking an oath and not by affirmation. Religion to this extent is thus textually woven into the very core of all government in the United States at the highest levels, *i.e.,* the major governmental officials. And this requirement has been applied to every major governmental official in the United States for the past 193 years.

The taking of an oath, and the recognition of religion that it manifests, can hardly be construed as *"establishing* religion." Similarly, the offering of an invocation prior to sessions in Congress does not amount to the *establishment* of religion worthy of First Amendment attack. Though no Supreme Court case has passed definitively on this latter point, there have been at least four cases in which Justices have *strongly* implied a concurrence in such a conclusion (and *no* cases implying otherwise). In *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1962), Justice Brennan wrote in his concurrence:

> The saying of invocational prayers in legislative chambers, state or federal, and the appointment of legislative chaplains, might well represent no involvements of the kind prohibited by the Establishment Clause. Legislators, federal and state, are mature adults who may presumably absent themselves from such public and ceremonial exercises without incurring any penalty, direct or indirect.

374 U.S. at 299–300, 83 S.Ct. at 1612–1613. (Brennan, J., concurring).[†] Earlier in *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), Justice Douglas had gone one step further by noting:

The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways in which there shall be no concert or union or dependency one on the other. *That is the common sense of the matter.* Otherwise the state and religion would be aliens to each other—hostile, suspicious and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. *Prayers in our legislative halls;* the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "so help me God" in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: "God save the United States and this Honorable Court."

343 U.S. at 312–13, 72 S.Ct. at 683–84 (Douglas, J.) (emphasis added). Similarly, Justice Stewart noted in *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1961):

> At the opening of each day's Session of this Court we stand, while one of our officials invokes the protection of God. Since the days of John Marshall our Crier has said, "God save the United States and this Honorable Court." *Both the Senate and the House of Representatives open their daily Sessions with prayer.* Each of our Presidents, from George Washington to John F. Kennedy, has upon assuming his Office asked the protection and help of God.

[†] Justice Brennan repudiated this statement in his dissenting opinion in *Marsh v. Chambers,*

—— U.S. ——, ——, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983) (Brennan, J., dissenting).]

I do not believe that this Court, or the Congress, or the President has by the actions and practices I have mentioned established an "official religion" in violation of the Constitution.

370 U.S. at 446–50, 82 S.Ct. at 1275–77 (Stewart, J., dissenting) (emphasis added). Finally, Justice Reed noted in *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1947), concerning the Establishment Clause:

The practices of the federal government offer many examples of this kind of "aid" by the state to religion. *The Congress of the United States has a chaplain for each House who daily invokes divine blessings and guidance for the proceedings.* The armed forces have commissioned chaplains from early days. They conduct the public services in accordance with the liturgical requirements of their respective faiths, ashore and afloat, employing for the purpose property belonging to the United States and dedicated to the services of religion. Under the Servicemen's Readjustment Act of 1944, eligible veterans may receive training at government expense for the ministry in denominational schools. The schools of the District of Columbia have opening exercises which "include a reading from the Bible without note or comment, and the Lord's prayer."

. . . [T]he history of past practices is determinative of the meaning of [the Establishment] clause . . . .

333 U.S. at 253–56, 68 S.Ct. at 485–87 (Reed, J., dissenting) (emphasis added). *See also, Florey v. Sioux Falls School District 49–5,* 619 F.2d 1311, 1329 (8th Cir.1980) (McMillian, J., dissenting) ("Of course, 'every vestige, however slight, of cooperation or accommodation between religion and government' is *not* unconstitutional. . . . For example . . . legislatures are served by chaplains.").

That opening legislative sessions with invocations does not violate the Establishment Clause is also borne out by the fact that the Congress, whose first act in organizing included providing for a chaplain and electing one, was the *same* Congress that passed the First Amendment. 1 *Journal of the Senate* 16, 1 *Journal of the House of Representatives* 26. It can thus hardly be presumed that Congress considered that the Establishment Clause it included in the First Amendment would prohibit Congress from having chaplains, since the election of a chaplain had been their first order of business after organization.[9]

Nor was this the only indication that Congress viewed the appointment and compensation of legislative chaplains to be constitutional. In the mid-nineteenth century, Congress undertook an extensive consideration of the constitutionality of those practices and found them absolutely consistent with the provisions of the Establishment Clause. In a passage leaving *no* room for misinterpretation on this point, the Senate noted, for example:

If Congress has passed, or should pass, any law which, fairly construed, has in any degree introduced, or should attempt to introduce, in favor of any church, or ecclesiastical association, or system of religious faith, all or any one of these obnoxious particulars—endowment at the public expense, peculiar privileges to its members, or disadvantages or penalties upon those who should reject its doctrines or belong to other communions—such law would be a "law respecting an establishment of religion," and, therefore, in violation of the Constitution. But no law yet passed by Congress is justly liable to such an objection. Take, as an example, the chaplains to Congress. At every session two chaplains are elected—one by each house—whose duty is to offer prayers daily in the two houses and to conduct religious services weekly in the hall of the House of Representatives. Now, in this, no religion, no form of faith, no denomination of religious professors, is established, in preference to any other, or has

9. For the view of a later Senate on this very matter, see note 10 *infra.*

any peculiar privileges conferred upon it. The range of selection is absolutely free in each house amongst all existing professions of religious faith. There is no compulsion exercised or attempted, upon any member or officer of either house, to attend their prayers or religious solemnities. No member gains any advantage over another by attending, or incurs any penalty or loses any advantages by declining to attend. The chaplain is an officer of the house which chooses him, and nothing more. He owes his place not to his belonging to a particular religious society, or holding a particular faith, but to the voluntary choice of the members of the house, and stands, in this respect, upon the same footing with any other officer so elected. It is not seen, therefore, how the institution of chaplains is justly obnoxious to the reproach of invading religious liberty in the widest sense of that term.

**10.** The Senate also laid any doubts to rest as to what *it* thought could be gleaned from the fact that the Congress that adopted the First Amendment had paid legislative chaplains.

> The whole view of the petitioners seems founded upon mistaken conceptions of the meaning of the Constitution. This is evidence—if not from what we have said, from this consideration—that, from the beginning, our government has had chaplains in its employment. If this had been a violation of the Constitution—an establishment of religion—why was not its character seen by the great and good men who were coeval with the government—were in Congress and in the Presidency when this constitutional amendment was adopted? They were wise to discover the true character of the measure; they, if any one did, understood the true purport of the amendment, and were bound, by their duty and their oaths, to resist the introduction or continuance of chaplains, if the views of the petitioners were correct. But they did no such thing; and therefore we have the strongest reason to suppose the notion of the petitioners to be unfounded. Unfounded it no doubt is. Our fathers were true lovers of liberty, and utterly opposed to any constraint upon the rights of conscience. They intended, by this amendment, to prohibit "an establishment of religion" such as the English church presented, or anything like it. But they had no fear or jealousy of religion itself, nor did they wish to see us an irreligious people; they did not intend to prohibit

S.Rep. No. 376, 32d Cong., 2d Sess. (1853).[10] *See also* H.R.Rep. No. 171, 31st Cong., 1st Sess. (1850); and H.R.Rep. No. 124, 33d Cong., 1st Sess. (1854).

The congressional findings on these constitutional questions should be given great weight by this court. "The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality." *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981).

Further indication that the invocations given at the beginning of each legislative session are not in violation of the Establishment Clause exists in the long standing practices of having compensated chaplains in the armed forces and in prisons. To date, no case has invalidated either of these later types of chaplaincies on Establishment Clause grounds. Indeed, the appointment and compensation of at least the prison chaplains have been upheld in the face of

> a just expression of religious devotion by the legislators of the nation, even in their public character as legislators; they did not intend to send our armies and navies forth to do battle for their country without any national recognition of that God on whom success or failure depends; they did not intend to spread over all the public authorities and the whole public action of the nation the dead and revolting spectacle of atheistical apathy. Not so had the battles of the revolution been fought, and the deliberations of the revolutionary Congress conducted. On the contrary, all had been done with a continual appeal to the Supreme Ruler of the world, and an habitual reliance upon His protection of the righteous cause which they commended to His care.
>
> What has thus been done, with modifications, indeed, to suit external circumstances and particular exigencies, but in substance always the same from the beginning of our existence as a nation; what met the approval of our Washington, and of all the great men who have succeeded him; what commands the general commendation of the people; what is at once so venerable and so lovely, so respectable and respected—ought not, in the opinion of the committee, now to be discontinued.
>
> The committee, therefore, pray to be discharged from the further consideration of the petitions.
>
> *Id.*

First Amendment attack.[11] *See, e.g., Abington School District v. Schempp, supra,* 374 U.S. at 299, 83 S.Ct. at 1612 (Brennan, J., concurring); *Theriault v. Silber,* 547 F.2d 1279 (5th Cir.1977); *Protestants and Other Americans United for Separation of Church and State v. O'Brien,* 272 F.Supp. 712, 721 (D.D.C.1967). *See also Florey v. Sioux Falls School District 49–5, supra,* 619 F.2d at 1329 n. 6 (McMillian, J., dissenting).

It is thus my conclusion that the textually committed right to recognize religion implicit in the authorization to Congress to choose its officers and to formulate the rules of its proceedings, a right consistent with the recognition of religious rights elsewhere in the Constitution, does *not* constitute an "establishment of religion" in contravention of the First Amendment. Any contention that the appointment or payment of congressional chaplains violates the Establishment Clause must accordingly fail.

In sum, the practice of appointing *and* compensating legislative chaplains is textually committed to Congress by the Constitution in a manner that indicates it is not in conflict with the Establishment Clause of the First Amendment. It is therefore entirely protected from our review by the political question doctrine.

### B. Lack of Respect Due a Coordinate Branch

The implementation of constitutional authorization to the houses of Congress to appoint and compensate their respective chaplains is clearly a matter of internal administration to be dealt with solely by the members of the respective houses of Congress. Only if these two practices are in violation of another part of the Constitution could this internal matter be evaluated by a party outside of Congress, viz., by the courts. As has been demonstrated, the appointment and compensation at issue do not contravene any other provision in the Constitution. Accordingly, the power of Congress here is "absolute and beyond the challenge of any other body or tribunal." *United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892); *McGrain v. Daugherty,* 273 U.S. 135, 181–82, 47 S.Ct. 319, 331, 71 L.Ed. 580 (1927).

For this court to scrutinize the appointment and compensation of the chaplain of the House and Senate would be a patent interference with the internal affairs of a coordinate branch of government. Insofar as such action would fly into the face of Congress and its specified powers it would demonstrate that "lack of respect" which is prohibited to courts by the political question doctrine as articulated in *Baker v. Carr, supra.*[12] This provides an additional reason for this court to dismiss appellants' Establishment Clause attack as being nonjusticiable.

### CONCLUSION

The majority has either misconstrued or misapplied the political question ... [doctrine] as applied to this case. As demonstrated above, appellants' claim should be dismissed .... It has also been suggested:

> If there be a God who hears prayer—as we believe there is—we submit, that

---

11. While the courts have not specifically examined the constitutionality of the appointment and compensation of chaplains in the armed forces, Congress itself has considered the issue in its entirety and found *no* Establishment Clause violation of any kind. Employing an "implied federal power" analysis such as that used above in my argument on the textual commitment of legislative chaplains to Congress, the House of Representatives noted:

> We presume all will grant that it is proper to appoint physicians and surgeons in the army and navy. The power to appoint chaplains is just the same, because neither are expressly named, but are appointed under the general authority to organize the army and navy, and we deem the one as truly a matter of necessity as the other.

H.R.Rep. No. 124, 33d Cong., 1st Sess. (1854).

12. As the District Court so aptly noted on this point,

> [I]n the circumstances here, the conclusion seems inescapable that it would be "impossible" for this Court, consistently with the respect which courts owe to coordinate branches of government and to each other, to undertake an "independent resolution" of the question of Congress' power to compensate its Chaplains, on this complaint of these particular taxpayers.

*Murray v. Morton,* 505 F.Supp. 144, 147 (D.D. C.1981).

there never was a deliberative body that so eminently needed the fervent prayers of righteous men as the Congress of the United States. There never was another representative assembly that had so many and so widely different interests to protect and to harmonize, and so many local passions to subdue. One member feels charged to defend the rights of the Atlantic, another of the Pacific coast; one urges the claims of constituents on the borders of the torrid, another on the borders of the frigid zone; while hundreds have the defence of local and varied interests stretching across an entire continent. If personal selfishness or ambition, if party or sectional views alone, bear rule, all attempts at legislation will be fruitless, or bear only bitter fruit. If wisdom from above, that is profitable to direct, be given in answer to the prayers of the pious, then Congress need those devotions, as they surely need to have their views of personal importance daily chastened by the reflection that they are under the government of a Supreme Power, that rules not for one locality or one time, but governs a world by general laws, subjecting all motives and acts to an omniscient scrutiny, and holds all agents to their just awards by an irresistible power.

H.R.Rep. No. 124, 33d Cong., 1st Sess., 6–7 (1854). These same considerations exist today in greatly magnified form.

For all of the above reasons I therefore respectfully dissent.

GINSBURG, Circuit Judge, separate statement in which Senior Circuit Judge BAZELON concurs:

*Marsh v. Chambers,* —— U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), as the per curiam opinion I join explains, is dispositive of this controversy. The Supreme Court ruled squarely *on the merits* that no establishment clause violation occurs when a state legislature engages a chaplain and uses public funds to pay for the chaplain's services. The High Court acknowledged state taxpayer standing to raise the question,[1] and found no other justiciability barrier.

By contrast, the district court, and the majority of the panel initially assigned to the appeal in this case, *never reached the merits.* The district court held (1) complainants, who sued as federal taxpayers, lacked standing to question the public funding of congressional chaplaincies; and (2) federal spending for the chaplaincies presented a "political question" which should not be addressed *at all* by federal judges. The three-judge panel on appeal reversed 2–1; *expressing no opinion on the merits,*[2] it simply held the controversy justiciable and returned it to the district court for consideration and resolution on the merits in the first instance.[3] The en banc per curiam disposition vacates both the district court's and the original appellate panel's decisions, and thus leaves open the two divisive justiciability issues (standing and political question) initially confronted in the case.

The nation's High Court has now indicated unambiguously how the merits of the controversy must be resolved, obviating any need for a postscript from the district court or this court on the constitutionality of Congress' historic practice.

Judge MacKinnon, who dissented from the three-judge panel decision, nevertheless reprints the bulk of his dissenting opinion, which purports to declare, *as the Supreme Court surely did not,* that the case is nonjusticiable. But it is plain from Judge MacKinnon's presentation that he easily cleared all threshold hurdles. Far from avoiding the merits, as the panel majority did, he decided the question presented and

---

1. At —— n. 4, 103 S.Ct. at 3338 n. 4.

2. The panel majority wrote:

   We ... do not reach the merits, and intimate no view on the question whether the challenged expenditures violate the establishment clause.

3. The panel majority said in conclusion that the first amendment establishment clause issue presented

   is a proper one for resolution by the courts, and this case is remanded to the district court so that it may undertake such a resolution.

then, curiously, labeled it "political," therefore not subject to federal court adjudication. The reader is left to wonder how a judge can say, after indulging in an unrestrained discussion and resolution of an issue on its merits, that the question he has just resolved is, despite that resolution, "nonjusticiable."

Perhaps Judge MacKinnon, by reviewing the challenged government action and squarely deciding that it is within the authority of Congress, has recognized, tacitly, that there is no genuine political question doctrine and no need for one. *See* Henkin, *Is There a "Political Question" Doctrine?*, 85 YALE L.J. 597 (1976) (in no case did the Supreme Court have to use the phrase "political question" because in fact the Court did review the action at issue and determined that it was within the constitutional authority of the President or Congress).[4] If that is the case, Judge MacKinnon should say so forthrightly and remove the obfuscating "political question" label from his opinion along with the pretense that he found the controversy inappropriate for court adjudication.

4. *But cf. Goldwater v. Carter,* 444 U.S. 996, 1005–06, 100 S.Ct. 533, 538–39, 62 L.Ed.2d 428 (1979) (Rehnquist, J., concurring in the judgment) (A separation of powers question within the Federal Government characterized as "political" may not be addressed by federal courts at all; regardless of the challenger, questions so labeled are nonjusticiable.).